UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KEITH STANSELL,                                     CASE NO.:
MARC GONSALVES,
THOMAS HOWES, and
JUDITH G. JANIS, CHRISTOPHER T. JANIS,
GREER C. JANIS, MICHAEL I. JANIS,
and JONATHAN N. JANIS

      Plaintiffs,

vs.

REVOLUTIONARY ARMED FORCES OF COLOMBIA (FARC);
JUVENAL OVIDIO RICARDO PALMERA PINEDA a/k/a "Simon Trinidad";
NAYIBE ROJAS VALDERAMA a/k/a "Sonia";
JOSE ANTONIO CELIS a/k/a "Calvo";
JUAN DIEGO GIRALDO a/k/a "Flaco";
GUILLERMO LEÓN SÁENZ a/k/a "Alfonso Cano";
LUCIANO MARÍN a/k/a "Iván Márquez";
VICTOR JULIO SUAREZ ROJAS, a/k/a "Jorge Briceno Suarez," a/k/a "Mono Jojoy";
RODRIGO LONDOÑO ECHEVERRY a/k/a "Timochenko" a/k/a "Timoleón Jiménez";
PEDRO ALDANA,
JORGE TORRES VICTORIA, a/k/a "Pablo Catatumbo,"
GUILLERMO ENRIQUE TORRES CUETER, a/k/a "Julian Conrado,"
FELIX ANTONIO MUNOZ LASCARRO, a/k/a "Jose Lisandro Lascarro," a/k/a "Pastor Alape," MILTON DE JESUS TONCEL REDONDO, a/k/a "Joaquin Gomez,"
JOSE BENITO CABRERA CUEVAS, a/k/a "Fabian Ramirez,"
ABELARDO CAICEDO COLORADO, a/k/a "Solis Almeida,"
LUIS ANTONIO LOZADA, a/k/a "Carlos Antonio Lozada,"
SIXTO ANTONIO CABANA GUILLEN, a/k/a "Domingo Bioho,"
VICTOR RESTREPO, a/k/a "Victor Tirado," a/k/a "Rigoberto Lozano,"
HERMILO CABRERA DIAZ, a/k/a "Bertulio,"
ALVRO ALFONSO SERPA DIAZ, a/k/a "Felipe Rincon,"
EDGAR LOPEZ GOMEZ, "Miller Munar Munar, a/k/a "Pacho Chino,"
MIGUEL ANGEL PASCUAS SANTOS, a/k/a "Sargento Pascuas," a/k/a "Humberto,"
NOE SUAREZ ROJAS, a/k/a "German Briceno Suarez," a/k/a "Grannobles,"
HENRY CASTELLANOS GARZON, a/k/a "Romana,"
GENER GARCIA MOLINA, a/k/a "John Hernandez," a/k/a "Johnny 40,"
ELMER CAVIEDES, a/k/a "Albiero Cordoba,"
MIGUEL SANTANILLA BOTACHE, a/k/a "Gentil Duarte,"
GILDARDO GARCIA CARDONA, a/k/a "Alviro Rojas,"

TOMAS MOLINA CARACAS, a/k/a "Negro Acacio,"
EFRAIN MENDEZ, a/k/a "Guillermo," a/k/a "Cochornea,"
CARLOS ALBERTO GARCIA, a/k/a "Herimides Buitrago," a/k/a "Oscar Montero";
NORBEI CAMARGO, a/k/a "James Patapalo,"
ERASMO TRASLAVINA BENAVIDES, a/k/a "Ismardo Lozada," a/k/a "Jimmy Guerrero,"
JOSE EPINEMIO MOLINA GONZALEZ, a/k/a "Danilo Garcia,"
JAIME COTRINO DIAZ, a/k/a "Arcesio,"
ALONSO OLARTE LOMBANA, a/k/a "Luis Eduardo Marin," a/k/a "Rafael Gutierrez,"
FERNELLI RIZO CARRASCAL, a/k/a "Marco Fanfan," a/k/a "Jurga Jurga,"
IGNACIO LEAL GARCIA, a/k/a "Camilo," a/k/a "Tuerto,"
LUIS EDUARDO LOPEZ MENDEZ, a/k/a "Efren Arboleda,"
OMAR OYOLA ESTUPINAN, a/k/a "Jorge Humberto Cortes," a/k/a "JH,"
GUSTAVO GONZALEZ SANCHEZ, a/k/a "Rambo,"
RAFAEL CEPILLO,
EDGAR SALGADO ARAGON, a/k/a "Rodrigo," a/k/a "Cadete,"
ERNESTO HURTADO PENALOSA, a/k/a "Negro Elecier,"
EMIRO DEL CARMEN ROPERO SUAREZ, a/k/a "Ruben Zamora," and
LUIS EDUARDO OYOLA DIAZ, a/k/a "Esponja,"
RODRIGO GRANDA a/k/a "Ricardo Gonzalez";
JAIRO ALFONSE LESMES BULLA;
ORLAY JURADO PALOMINO;
FRANCISCO ANTONIO CADENA COLLAZOS;
NUBIA CALDERON DE TRUJILLO;
OVIDIO SALINAS PEREZ;
JORGE DAVALOS TORRES;
EFRAIN PABLO REJO FREIRE;
LILIANA LOPEZ PALACIOS;
MARIA REMEDIOS GARCIA ALBERT a/k/a "Soraya" a/k/a "Irene";
OMAR ARTURO ZABALA PADILLA, a/k/a "Lucas Gualdron";
VLAUDIN RODRIGO VEGA a/k/a Carlos Vlaudin;
GERARDO ANTONIO AGUILAR RAMIREZ a/k/a "Cesar";
ERMINSO CUEVAS CABRERA a/k/a "Mincho";
JORGE ENRIQUE RODRIGUEZ MENDIETA a/k/a "Ivan Vargas";
JUAN JOSE MARTINEZ VEGA a/k/a "Chiguiro";
NANCY CONDE RUBIO a/k/a "Doris Adriana";
JOSE MARIA CORREDOR IBAGUE a/k/a "El Boyaco";
ALEXIS FREDDY MOSQUERA-RENTERIA a/k/a "Ronald";
YARLEI BANOL-RAMOS a/k/a "Diana";
JORGE ABEL IBARGUEN-PALACIO a/k/a "Turbo";
CAROLINA YANAVE ROJAS;
ANA ISABEL PENA AREVALO a/k/a "Dona Chava"
LUZ MERY GUTIERREZ VERGARA a/k/a "Mery"
JOSE FERNANDO ROMERO MEJIA a/k/a "El Morocho"

JOSUE CUESTA LEON a/k/a "El Viejo"
MARIBEL GALLEGO RUBIO a/k/a "Maritza"
CAMILO RUEDA GIL a/k/a "El Primo"
ANA LEONOR TORRES a/k/a "Juliana"
BLADIMIR CULMA SUNZ a/k/a "Vladimir"
ALEXANDER FARFAN SUAREZ a/k/a "Enrique Gafas";
MARTIN CUERO;
HELI MEJIA MENDOZA a/k/a "Martin Sombra";
GABRIEL CULMA;
JOSE ARMANDO CADENA CABRERA, a/k/a "Bronco";
WILKIN FERNANDO LUGO a/k/a "Teofilo Florero";
WALTER TAPIERO a/k/a "Commander Romel";
WILSON URBANO LOPEZ a/k/a "Reciclo";

     Defendants.

_____/

## COMPLAINT

     Plaintiffs sue Defendants and allege:

## THE ACTION,  EXCLUSIVE JURISDICTION & VENUE

1.     This is a civil action for damages arising from acts of international terrorism committed

by the REVOLUTIONARY ARMED FORCES OF COLOMBIA ("FARC"), or in Spanish

FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, and its members, which

occurred in Colombia commencing on February 13, 2003 when Plaintiffs' aircraft was shot

down.  After a successful crash landing, the pilot, THOMAS JANIS, was shot and killed by the

FARC.  The FARC imprisoned KEITH STANSELL, MARC GONSALVES and THOMAS

HOWES and held them hostage against their will and hidden in the Colombian jungle for over 5

years until July 2, 2008 (1,967 days total captivity).

2.     This action is brought pursuant to the civil remedies provisions of the Anti-Terrorism

Act, 18 U.S.C. § 2333 which provides:

**"(a) Action and jurisdiction.--**Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."

3.     Plaintiffs seek damages against a designated foreign terrorist organization (FTO), the FARC and select members in leadership who committed acts of international terrorism or conspired to commit acts of international terrorism or provided material support to the FARC.

4.     Pursuant to 18 U.S.C. § 2338, the district courts of the United States have exclusive jurisdiction over this action.

5.     Venue is proper where any Plaintiff resides pursuant to 18 U.S.C. § 2334(a), therefore venue is proper in this district because Plaintiffs KEITH STANSELL, THOMAS HOWES, and JONATHAN JANIS reside in the Middle District of Florida.  Defendants are all alien nationals and may be sued in any district pursuant to 28 U.S.C. § 1391(d).

6.     This action does not allege any claims seeking imprisonment or criminal punishment against any defendant, nor does any defendant face any loss of liberty in this civil action, nor is any defendant entitled to provision of counsel in this civil action under the Criminal Justice Act, 18 U.S.C. §  3006A, or the 6th Amendment to the U.S. Constitution.

## **THE PLAINTIFFS**

7.     Plaintiff KEITH STANSELL is a U.S. citizen residing in Manatee County, Florida who was injured by repeated acts of international terrorism occurring from February 13, 2003 and continuing through the date of his rescue on July 2, 2008.  Keith Stansell is a former United States Marine and was the mission commander for the February 13, 2003 counter narcotics mission.

8.     Plaintiff MARC GONSALVES is a U.S. citizen residing in Connecticut who was injured by repeated acts of international terrorism occurring from February 13, 2003 and continuing through the date of his rescue on July 2, 2008.  Marc Gonsalves is an electronic surveillance systems specialist and was the chief counter narcotics analyst and collection officer on the February 13, 2003 mission.

9.     Plaintiff THOMAS HOWES is a U.S. citizen residing in Brevard County, Florida who was injured by repeated acts of international terrorism occurring from February 13, 2003 and continuing through the date of his rescue on July 2, 2008.  Thomas Howes is a highly experienced pilot and a specialist in the counter narcotics mission.

10.    Plaintiff, JUDITH G. JANIS, is a U.S. citizen and resident of Alabama and is the surviving spouse and personal representative of the Estate of Thomas J. Janis.

11.    Plaintiff CHRISTOPHER T. JANIS is a U.S. citizen and resident of New York State and the surviving son of Thomas J. Janis.  Christopher Janis is on active duty with the United States military.

12.    Plaintiff GREER C. JANIS is a U.S. citizen and resident of Virginia and the surviving daughter of Thomas J. Janis.

13.    Plaintiff MICHAEL I. JANIS is a U.S. citizen and resident of Alabama and the surviving son of Thomas J. Janis.  Michael Janis is on active duty with the United States military.

14.    Plaintiff, JONATHAN N. JANIS is a U.S. citizen and resident of Orange County Florida and the surviving son of Thomas J. Janis.

15.     At all times material, decedent, Thomas J. Janis was a citizen of the United States.  The

FARC murdered Thomas Janis on February 13, 2003.

### DEFENDANTS

16.     Defendant, REVOLUTIONARY ARMED FORCES OF COLOMBIA ("FARC"), or

in Spanish FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, is a foreign

terrorist organization subject to the jurisdiction of this Court.  Defendant, FARC is a

designated foreign terrorist organization pursuant to Title 8, United States Code, Section

1189 originally designated on October 8, 1997 and re-designated on September 5, 2001.

17.     Defendant, JUVENAL OVIDIO RICARDO PALMERA PINEDA a/k/a "Simon

Trinidad" is incarcerated in federal prison in Colorado after being convicted in federal court

in the District of Columbia of conspiracy to commit hostage taking on the Plaintiffs and is

subject to the jurisdiction of this Court.

18.     Defendant NAYIBE ROJAS VALDERAMA a/k/a "Sonia" was a finance officer for

the FARC and is currently incarcerated in the U.S. after being convicted of narcotics

trafficking in federal court in the District of Columbia and is subject to the jurisdiction of this

Court.

19.     Defendant JOSE ANTONIO CELIS a/k/a "Calvo" was a FARC drug trafficker and is

currently incarcerated in the U.S. after being convicted of narcotics trafficking in federal

court in the District of Columbia and is subject to the jurisdiction of this Court.

20.     Defendant JUAN DIEGO GIRALDO a/k/a "Flaco" worked with Sonia and Calvo to

purchase and transport cocaine, bought equipment for the FARC's cocaine production

operation, and assisted Sonia and the FARC in all aspects of cocaine production and sale, and

is currently incarcerated in the U.S. after being convicted of narcotics trafficking in federal court in the District of Columbia and is subject to the jurisdiction of this Court.

21.     Defendant GUILLERMO LEÓN SÁENZ a/k/a "Alfonso Cano", is currently the main leader of the FARC's Secretariat and is a fugitive hiding in Colombia and/or Venezuela and is subject to the jurisdiction of this Court.

22.     Defendant LUCIANO MARÍN a/k/a "Iván Márquez" is a member of the FARC's Secretariat and is a fugitive hiding in Colombia and/or Venezuela and is subject to the jurisdiction of this Court.

23.     Defendant VICTOR JULIO SUAREZ ROJAS, a/k/a "Jorge Briceno Suarez," a/k/a "Mono Jojoy," is a member of the FARC's Secretariat and is a fugitive hiding in Colombia and/or Venezuela and is subject to the jurisdiction of this Court.

24.     Defendant RODRIGO LONDOÑO ECHEVERRY a/k/a "Timochenko" a/k/a "Timoleón Jiménez" is a member of the FARC's Secretariat and is a fugitive hiding in Colombia and/or Venezuela and is subject to the jurisdiction of this Court.

25.     The following Defendants are current or former members of the FARC's Estado Mayor and are all fugitives hiding in Colombia and/or Venezuela and are all subject to the jurisdiction of this Court:

   a) PEDRO ALDANA,
   b) JORGE TORRES VICTORIA, a/k/a "Pablo Catatumbo,"
   c) GUILLERMO ENRIQUE TORRES CUETER, a/k/a "Julian Conrado,"
   d) FELIX ANTONIO MUNOZ LASCARRO, a/k/a "Jose Lisandro Lascarro," a/k/a "Pastor Alape,"
   e) MILTON DE JESUS TONCEL REDONDO, a/k/a "Joaquin Gomez,"
   f) JOSE BENITO CABRERA CUEVAS, a/k/a "Fabian Ramirez,"
   g) ABELARDO CAICEDO COLORADO, a/k/a "Solis Almeida,"
   h) LUIS ANTONIO LOZADA, a/k/a "Carlos Antonio Lozada,"

    i)   SIXTO ANTONIO CABANA GUILLEN, a/k/a "Domingo Bioho,"

    j)   VICTOR RESTREPO, a/k/a "Victor Tirado," a/k/a "Rigoberto Lozano,"

    k)  HERMILO CABRERA DIAZ, a/k/a "Bertulio,"

    l)   ALVRO ALFONSO SERPA DIAZ, a/k/a "Felipe Rincon,"

    m) EDGAR LOPEZ GOMEZ, "Miller Munar Munar, a/k/a "Pacho Chino,"

    n)  MIGUEL ANGEL PASCUAS SANTOS, a/k/a "Sargento Pascuas," a/k/a "Humberto,"

    o)  NOE SUAREZ ROJAS, a/k/a "German Briceno Suarez," a/k/a "Grannobles,"

    p)  HENRY CASTELLANOS GARZON, a/k/a "Romana,"

26.    The following Defendants are current or former FARC Front Commanders and are all fugitives hiding in Colombia and/or Venezuela and are all subject to the jurisdiction of this Court:

    a)  GENER GARCIA MOLINA, a/k/a "John Hernandez," a/k/a "Johnny 40,"

    b)  ELMER CAVIEDES, a/k/a "Albiero Cordoba,"

    c)  MIGUEL SANTANILLA BOTACHE, a/k/a "Gentil Duarte,"

    d)  GILDARDO GARCIA CARDONA, a/k/a "Alviro Rojas,"

    e)  TOMAS MOLINA CARACAS, a/k/a "Negro Acacio,"

    f)  EFRAIN MENDEZ, a/k/a "Guillermo," a/k/a "Cochornea,"

    g)  CARLOS ALBERTO GARCIA, a/k/a "Herimides Buitrago" a/k/a "Oscar Montero" a/k/a "Paisa,"

    h)  NORBEI CAMARGO, a/k/a "James Patapalo,"

    i)   ERASMO TRASLAVINA BENAVIDES, a/k/a "Ismardo Murcia Lozada" a/k/a "Jimmy Guerrero,"

    j)   JOSE EPINEMIO MOLINA GONZALEZ, a/k/a "Danilo Garcia,"

    k)  JAIME COTRINO DIAZ, a/k/a "Arcesio,"

    l)   ALONSO OLARTE LOMBANA, a/k/a "Luis Eduardo Marin" a/k/a "Rafael Gutierrez,"

    m) FERNELLI RIZO CARRASCAL, a/k/a "Marco Fanfan," a/k/a "Jurga Jurga,"

    n)  IGNACIO LEAL GARCIA, a/k/a "Camilo" a/k/a "Tuerto,"

    o)  LUIS EDUARDO LOPEZ MENDEZ, a/k/a "Efren Arboleda,"

    p)  OMAR OYOLA ESTUPINAN, a/k/a "Jorge Humberto Cortes" a/k/a "JH,"

    q)  GUSTAVO GONZALEZ SANCHEZ, a/k/a "Rambo,"

    r)   RAFAEL CEPILLO,

    s)   EDGAR SALGADO ARAGON, a/k/a "Rodrigo" a/k/a "Cadete,"

    t)   ERNESTO HURTADO PENALOSA, a/k/a "Negro Elecier,"

    u)  EMIRO DEL CARMEN ROPERO SUAREZ, a/k/a "Ruben Zamora," and

    v)  LUIS EDUARDO OYOLA DIAZ, a/k/a "Esponja,"

27.     Defendant, RODRIGO GRANDA a/k/a "Ricardo Gonzalez" is a Colombian national who is a member of the FARC's international commission who was captured in Venezuela, returned to Colombian authorities, then later released as part of a prisoner exchange, and is now a fugitive residing in Venezuela and is subject to the jurisdiction of this Court.

28.     Defendant JAIRO ALFONSE LESMES BULLA is a Colombian national who is a member of the FARC international commission for Ecuador, Argentina, Chile, Uruguay and Paraguay working abroad to obtain recruits, support and protection.  He was OFAC designated under the Foreign Narcotics Kingpin Designation Act on September 30, 2008 and is in the custody of Colombian authorities and is subject to the jurisdiction of this Court.

29.     Defendant ORLAY JURADO PALOMINO is a Colombian national who is a member of the FARC international commission for Venezuela working abroad to obtain recruits, support and protection.  He was OFAC designated under the Foreign Narcotics Kingpin Designation Act on September 30, 2008 and is now a fugitive residing in Venezuela and is subject to the jurisdiction of this Court.

30.     Defendant FRANCISCO ANTONIO CADENA COLLAZOS is a Colombian national who is a member of the FARC international commission for Brazil working abroad to obtain recruits, support and protection.  He was OFAC designated under the Foreign Narcotics Kingpin Designation Act on September 30, 2008 and is now a fugitive residing in Brazil and is subject to the jurisdiction of this Court.

31.     Defendant NUBIA CALDERON DE TRUJILLO is a Colombian national who is a member of the FARC international commission for Nicaragua working abroad to obtain recruits, support and protection.  She was OFAC designated under the Foreign Narcotics

Kingpin Designation Act on September 30, 2008 and was granted asylum and resides in Nicaragua and is subject to the jurisdiction of this Court.

32.     Defendant OVIDIO SALINAS PEREZ is a Colombian national who is a member of the FARC international commission for Panama who was OFAC designated under the Foreign Narcotics Kingpin Designation Act on September 30, 2008 and who is a fugitive and is subject to the jurisdiction of this Court.

33.     Defendant JORGE DAVALOS TORRES is a Colombian national who is a member of the FARC international commission for Canada who was OFAC designated under the Foreign Narcotics Kingpin Designation Act on September 30, 2008 and who is a fugitive and is subject to the jurisdiction of this Court.

34.     Defendant EFRAIN PABLO REJO FREIRE is a Colombian national who is a member of the FARC international commission for Peru who was OFAC designated under the Foreign Narcotics Kingpin Designation Act on September 30, 2008 and who is a fugitive and is subject to the jurisdiction of this Court.

35.     Defendant LILIANA LOPEZ PALACIOS is a Colombian national who is a member of the FARC international commission for Mexico who was OFAC designated under the Foreign Narcotics Kingpin Designation Act on September 30, 2008 and who is a fugitive and is subject to the jurisdiction of this Court.

36.     Defendant MARIA REMEDIOS GARCIA ALBERT a/k/a Soraya a/k/a "Irene" is a Spanish national who is a member of the FARC international commission for Spain, she was OFAC designated under the Foreign Narcotics Kingpin Designation Act on January 15,

2009, and is currently out on bail residing in Spain and is subject to the jurisdiction of this Court.

37.     Defendant OMAR ARTURO ZABALA PADILLA, a/k/a "Lucas Gualdron" is a Colombian national who is a member of the FARC international commission for France, Italy and Switzerland, he was OFAC designated under the Foreign Narcotics Kingpin Designation Act on January 15, 2009 and is a fugitive and is subject to the jurisdiction of this Court.

38.     Defendant VLAUDIN RODRIGO VEGA a/k/a "Carlos Vlaudin" is a Chilean national who is a member of the FARC international commission for Australia, he was OFAC designated under the Foreign Narcotics Kingpin Designation Act on January 15, 2009 and is a fugitive and is subject to the jurisdiction of this Court.

39.     Defendant GERARDO ANTONIO AGUILAR RAMIREZ a/k/a "Cesar" was a FARC commander and one of the Plaintiffs' jailers, he was OFAC designated under the Foreign Narcotics Kingpin Designation Act in July 2008, he has been extradited to the US and is currently incarcerated awaiting trial in federal court in the District of Colombia on both narcotics and kidnapping charges related to Plaintiffs and is subject to the jurisdiction of this Court.

40.     Defendant ERMINSO CUEVAS CABRERA a/k/a "Mincho" was a FARC commander of and finance chief, accused of sending 10,000 kg of cocaine to different countries each month, he has been extradited to the US and is currently incarcerated awaiting trial in federal court in the District of Colombia with Cesar and is subject to the jurisdiction of this Court.

41.     Defendant JORGE ENRIQUE RODRIGUEZ MENDIETA a/k/a "Ivan Vargas" is a FARC member and has been extradited to the US and is currently incarcerated awaiting trial in federal court in the District of Colombia with a/k/a Cesar and is subject to the jurisdiction of this Court.

42.     Defendant JUAN JOSE MARTINEZ VEGA a/k/a "Chiguiro" is a FARC member and has been extradited to the US and is currently incarcerated awaiting trial in federal court in the District of Colombia with Cesar and is subject to the jurisdiction of this Court.

43.     Defendant NANCY CONDE RUBIO a/k/a "Doris Adriana" was the logistics, finance, supply and material support coordinator for the FARC, she was also one of Plaintiffs' jailers, she was OFAC designated under the Foreign Narcotics Kingpin Designation Act in July 2008, she was extradited to the US on September 16, 2009 and is currently incarcerated awaiting trial in federal court in the District of Colombia with Cesar and is subject to the jurisdiction of this Court.

44.     Defendant JOSE MARIA CORREDOR IBAGUE a/k/a "El Boyaco" is a FARC member involved with weapons for drugs transactions, in control of clandestine FARC airstrips, he was OFAC designated under the Foreign Narcotics Kingpin Designation Act in July 2008, and was extradited to the US on October 10, 2008 and is currently incarcerated awaiting trial in federal court in the District of Colombia with Cesar and is subject to the jurisdiction of this Court.

45.     Defendant ALEXIS FREDDY MOSQUERA-RENTERIA a/k/a "Ronald" is a FARC member arrested in Panamian waters February 22, 2008 while manning a FARC patrol boat off Jaque, Panama, loaded with explosives, detonators, AK47s, ammunition, other military

gear and trace residue of cocaine, he was extradited to the US on April 17, 2009 and charged in federal court in NY with conspiring to provide material support to FARC and is incarcerated by the US awaiting trial and is subject to the jurisdiction of this Court.

46. Defendant YARLEI BANOL-RAMOS a/k/a "Diana" is a FARC member arrested in Panamanian waters February 22, 2008 while manning a FARC patrol boat off Jaque, Panama, loaded with explosives, detonators, AK47s, ammunition, other military gear and trace residue of cocaine, she was extradited to the U.S. on April 17, 2009 and charged in federal court in NY with conspiring to provide material support to FARC and is incarcerated by the US awaiting trial and is subject to the jurisdiction of this Court.

47. Defendant JORGE ABEL IBARGUEN-PALACIO a/k/a "Turbo" is a FARC member arrested in Panamanian waters February 22, 2008 while manning a FARC patrol boat off Jaque, Panama, loaded with explosives, detonators, AK47s, ammunition, other military gear and trace residue of cocaine, he was extradited to the U.S. on April 17, 2009 and charged in federal court in NY with conspiring to provide material support to FARC and is incarcerated by the U.S. awaiting trial and is subject to the jurisdiction of this Court.

48. Defendant CAROLINA YANAVE ROJAS is a FARC member extradited to the U.S. on October 10, 2008 and charged with manufacture and attempt to distribute cocaine in the U.S. to finance FARC operations and is incarcerated by the US awaiting trial and is subject to the jurisdiction of this Court.

49. ANA ISABEL PENA AREVALO a/k/a "Dona Chava" is a FARC member extradited to the U.S. and charged in the U.S. with hostage taking and is incarcerated by the U.S. awaiting trial and is subject to the jurisdiction of this Court.

50.     LUZ MERY GUTIERREZ VERGARA a/k/a "Mery" is a FARC member extradited to the U.S. and charged in the U.S. with hostage taking and is incarcerated by the U.S. awaiting trial and is subject to the jurisdiction of this Court.

51.     JOSE FERNANDO ROMERO MEJIA a/k/a "El Morocho" is a FARC member extradited to the U.S. and charged in the U.S. with narco-terrorsim and is incarcerated by the U.S. awaiting trial and is subject to the jurisdiction of this Court.

52.     JOSUE CUESTA LEON a/k/a "El Viejo" is a FARC member in Colombian custody and has been indicted in the U.S. for hostage taking and is subject to the jurisdiction of this Court.

53.     MARIBEL GALLEGO RUBIO a/k/a "Maritza" is a FARC member in Colombian custody and has been indicted in the U.S. for hostage taking and is subject to the jurisdiction of this Court.

54.     CAMILO RUEDA GIL a/k/a "El Primo" is a FARC member in Colombian custody and has been indicted in the U.S. for hostage taking and is subject to the jurisdiction of this Court.

55.     ANA LEONOR TORRES a/k/a "Juliana" is a FARC member in Colombian custody and has been indicted in the U.S. for hostage taking and is subject to the jurisdiction of this Court.

56.     BLADIMIR CULMA SUNZ a/k/a "Vladimir" is a FARC member in Colombian custody and has been indicted in the U.S. for hostage taking and is subject to the jurisdiction of this Court.

57.     Defendant ALEXANDER FARFAN SUAREZ a/k/a "Enrique Gafas" is a FARC

member who acted as Plaintiffs' jailer, he was OFAC designated under the Foreign Narcotics

Kingpin Designation Act in July 2008, is indicted in the U.S. and is in custody in Colombia

and is subject to the jurisdiction of this Court.

58.     Defendant MARTIN CUERO is a FARC member and top aide to MONO JOJOY

who was  responsible for logistics and drug trafficking activities of FARC, he was captured

by the Colombian army on June 12, 2009 and is in custody in Colombia is subject to the

jurisdiction of this Court.

59.     Defendant HELI MEJIA MENDOZA a/k/a "Martin Sombra" is a FARC member

who acted as one of Plaintiffs jailers, he was arrested in Colombia in February 2008 and is

the subject of a 17 count indictment in federal court in the District of Colombia but his

extradition to the US was denied by Colombia's Supreme Court on June 17, 2009 and he

remains in custody in Colombia is subject to the jurisdiction of this Court.

60.     Defendant GABRIEL CULMA is a FARC member who acted as Plaintiffs' jailer who

is in the custody of Colombian authorities is subject to the jurisdiction of this Court.

61.     Defendant WILKIN FERNANDO LUGO a/k/a "Teofilo Florero" is the head of a

FARC mobile column and is charged with aggravated ransom kidnapping, conspiracy to

commit a crime and aggravated homicide, serving sentence in Colombia (for other crimes),

he was indicted August 11, 2009 in Colombia for Plaintiffs' kidnappings and is in custody in

Colombia is subject to the jurisdiction of this Court.

62.     Defendant JOSE ARMANDO CADENA CABRERA, a/k/a "Bronco" is a FARC

member involved in the Plaintiffs' initial capture/murder, he was captured in Bogota on

15

August 23, 2009 and is in custody of the Colombian authorities is subject to the jurisdiction of this Court.

63.     Defendant WALTER TAPIERO a/k/a COMMANDER ROMEL is a FARC member who was directly responsible for supplies for hostages and is currently in custody of the Colombian authorities is subject to the jurisdiction of this Court.

64.     Defendant WILSON URBANO LOPEZ a/k/a "RECICLO" is a FARC member who was second in command of the FARC's drug trafficking activities and was recently arrested in Colombia and awaiting extradition proceedings to the US is subject to the jurisdiction of this Court.

65.     Defendants are all terrorists and current or former members of the foreign terrorist organization or terrorist party known as the FARC.

66.     Defendants intentionally and purposefully hid and concealed their true identities, physical whereabouts and their involvement in the FARC terrorist activities, including hostage taking, kidnapping, killing and imprisoning Plaintiffs.

### DEFENDANTS' PURPOSEFUL DIRECTION OF TERROR & ACTIVITIES AT CITIZENS OF THE UNITED STATES

67.     Defendants are terrorists who engage in international terrorism, including premeditated, politically motivated violence, threats of violence, hostage takings, murders and other terrorist related activities perpetrated against noncombatant targets including U.S. nationals including directing terrorist activities across national and international borders in order to influence U.S. and Colombian policy.

16

68.     Each defendant purposefully and intentionally participated in the FARC's criminal and international terrorism activities, including the kidnapping, hostage taking, imprisonment, and murder of Plaintiffs, directed at and knowing they were U.S. nationals.

69.     The defendants control illegal narcotics production Colombia and engage in international narcotics distribution and sale directed at the U.S. and its citizens, outside of the borders of Colombia and defendants use kidnapping, hostage taking and murder as part of their illegal narcotics trafficking as terrorist activities.

70.     Defendants conspired to shoot down a U.S. aircraft, kidnap U.S. citizens, or kill them, and to then hold them captive for and broadcast their photographs worldwide for the express purpose of inflicting terror on U.S. citizens and attempting to influence U.S. and Colombian government policy.

71.     Defendants are strongly anti-American, have specifically targeted American citizens, and have engaged in violent acts against Americans and Colombians.

72.     Defendants issued public statements in English and Spanish conveying anti-American views, marking Americans as targets, and condemning the policies of the United States.

73.     On February 13, 2003 plaintiffs were conducting a counter narcotics surveillance mission in a U.S registered aircraft when the FARC opened fire on the aircraft.  Post-crash investigation revealed the FARC had hit the aircraft with heavy machine gun fire before it had crash landed.

74.     FARC members have admitted that the FARC had intentionally fired at the aircraft to shoot it down, and capture its crew, knowing that it was a U.S. aircraft and U.S. national crew on-board.

75.     All five occupants of the plane survived a crash-landing, but were immediately taken captive by FARC terrorists who quickly located the downed plane.   The American pilot, Thomas Janis, and the Colombian soldier, Luis Alcides Cruz, were shot and killed by FARC members within minutes of the landing, and their bodies were left a short distance from the damaged plane.   The other three American hostages, Keith Stansell, Marc Gonsalves, and Thomas Howes were seized by force, taken hostage, and marched into the jungle by FARC members, where they were held captive for 1,967 days until their rescue July 2, 2008.

76.     The decedent, Thomas Janis was a retired United States Army Special Operations pilot, having served his last tour of duty before retirement as a Chief Warrant Officer Five member and Commander of Fixed Wing elements for a Special Forces Operational Detachment.  Following his 1998 military retirement, Thomas Janis was employed as a civilian flying reconnaissance and surveillance missions in Colombia in support of the global war against terrorism and narcotics trafficking.

77.     About two months after the plane crash, on April 27, 2003, the FARC issued a public communique taking credit for seizing and holding the three Americans hostage.   In that public letter, published to the United States, the FARC offered to release approximately 250 high level Colombian citizens that it was then holding hostage,[1] together with the three Americans captured on February 13, 2003, in exchange for certain political concessions from the Colombian government and to illegally influence the policy of the U.S.  The FARC demanded that the Colombian government carve out of its sovereign territory a demilitarized zone

---

[1] At the time, the FARC hostages included provincial governors (2-4), national legislators (10-15), military officers (100+), police officials (100+), and other foreign nationals who had been captured by the FARC.

(DMZ), which would be used as a new base of operations for the FARC, and release hundreds of FARC terrorists currently held by the Colombian authorities, as a condition for the release of the three American hostages.

78.     In July 2003, the defendants forced the Plaintiffs, Keith Stansell, Marc Gonsalves, and Thomas Howes to participate in a videotaped interview to prove that they were alive and being held by the defendants.  A FARC senior leader and defendant here, Mono Jojoy, told the plaintiffs, Keith Stansell, Marc Gonsalves, and Thomas Howes that the FARC Commander "has ordered us . . . to send a proof of life to your families."  The Plaintiffs' families lived inside the United States.  The "proof of life" was delivered to CBS News, an American media organization, in New York, New York and aired throughout the U.S.

79.     During the Plaintiffs' period of captivity, the defendants continued to engage in the establishment and operation of a finance, logistical, supply and support network and material support network outside of Colombia utilizing satellite phones and SIM ("Subscriber Identity Module") cards purchased, shipped, and serviced in Florida to support the hostage taking of the plaintiffs and other terrorist activities.

80.     Defendants conducted all manner of logistics, financing, soliciting material support from locations outside Colombia, and including the U.S.

81.     Defendants demanded, in a form of communication published in the U.S., the release of two convicted FARC terrorists in the U.S. or the defendants would kill, injure, and continue to forcible detain the plaintiffs.

82.     Defendants engaged in intentional and deliberate open, hostile, malignant, and barbaric actions directed and felt in this forum and designed to cause pain and sow terror in the U.S.

83.     Defendants' acts were intended to intimidate or coerce the Colombian and U.S. civilian population, to influence policy of the U.S. Government by intimidation or coercion, and to affect the conduct of a government by kidnapping, hostage taking and assassination.

84.     Defendants individually and collectively had fair warning and knew that their activities would subject them to the jurisdiction of the U.S. for criminal and civil liability.

85.     The defendants' decision to purposefully direct their terror at the U.S., and the fact that the plaintiffs' injuries, captivity and death arose out of terrorist activities, should suffice to cause the defendants, to "reasonably anticipate being haled into" a U.S. court.

86.     The Defendants have purposefully established minimum contacts with the U.S. as a whole.

87.     Defendants have purposefully directed their activities at U.S. citizens residing in this District and are therefore subject to the personal jurisdiction of this Court compatible with fair play and substantial justice.

88.     This Court may exercise personal jurisdiction over the defendants consistent with the Due Process Clause of the Fifth Amendment.

89.     Defendants are also subject to the jurisdiction of this Court under Florida's long arm statute, Fla. Stat. §48.193 because defendants engaged in substantial and not isolated business activities in Florida.

## ALLEGATIONS APPLICABLE TO ALL COUNTS

### The Terrorist Organization FARC

90.     The Revolutionary Armed Forces of Colombia – an English translation of the Spanish name of the group "Fuerzas Armadas Revolucionarias de Colombia" (commonly known as and referred to hereinafter as the "FARC") – is an armed and violent organization in the Republic of Colombia.

91.     The FARC is, and has been since its inception in 1964, engaged in armed conflict against the government of the Republic of Colombia, which is a constitutional, multi-party democracy.  The FARC seeks to destabilize all levels of the Colombian government by means of violence, including murders and hostage takings, threats of violence, and other terrorist related activities.  The FARC's activities throughout Colombia have caused hundreds of civilian deaths and injuries.

92.     The FARC has been strongly anti-American, characterizing American citizens as "military targets," it has engaged in violent acts against U.S. nationals in Colombia, including murders and hostage takings.

### The FARC Secretariat and Estado Mayor

93.     The FARC is a highly structured terrorist organization.  At the top of the organization is the Secretariat, the top seven leaders who are the ultimate decision makers of the FARC. Members of the Secretariat also have additional responsibilities, including acting as advisors to different regions of the FARC.

94.     The central governing body of the FARC is the Estado Mayor, or general counsel, which is directly under the Secretariat.  It is comprised of the seven members of the

21

Secretariat, and approximately 20 others.  Although the membership of the Estado Mayor changes, its members are comprised of Bloc Commanders, senior Front Commanders, and other individuals who have attained leadership positions within the FARC.

95.     The Secretariat and Estado Mayor set FARC policies for the entire organization, its international terrorism activities, including policies related to hostage taking and murder and the manufacture and distribution of cocaine paste and cocaine.

### The FARC Blocs, Fronts and Mobile Columns

96.     The FARC is comprised of approximately 77 Fronts and Mobile Columns (collectively, "Fronts").  These are designated by number (e.g., the "16th Front") or by name (such as "Teofilo Forero Castro Mobile Column" ("TFMC")).  The size of each Front varies, with between several dozen to more than hundreds of FARC members comprising a Front. Each Front controls all activities in a geographic area and its Front Commander has absolute over the Fronts terrorist activities, decisions on life and death and on manufacture and distribution of cocaine paste and cocaine.

97.     Front Commanders are typically assisted by one or more Finance Officers, who oversee all financial matters for the Front, including material support of terrorist activities, hostage captivity and maintenance and illegal narcotics manufacturing and distribution.

98.     Groups of Fronts and Mobile Columns are organized into geographical clusters, called Blocs or Joint Commands.  All Front Commanders report to the leadership of each Bloc, which is comprised of a small group of leaders which form the Estado Mayor of that particular Bloc.  The individual in charge of each Bloc Estado Mayor is known as the Bloc Commander for that Bloc.

### The FARC Acts  & Conspiracy to Engage in Acts of International Terrorism

99.     Defendants committed acts and did knowingly combine, conspire, confederate and agree, together, with each other, and with others, known and unknown to engage in acts of international terrorism against U.S. nationals, terrorism, and terrorist activity, including murder and hostage taking, violence and acts dangerous to human life and to provide material support and resources and financial support to a designated foreign terrorist organization, namely the FARC, knowing that the organization was designated as a terrorist organization, has engaged or engages in terrorist activity, and has engaged or engages in terrorism.  The material support also included proceeds from illegal narcotics and hostage and kidnapping activities. The defendants' acts of international terrorism transcend national boundaries and are committed to coerce or intimidate the policy of the U.S. and Colombia.

### The FARC's "Taxes" On Cocaine Manufacturing And Distribution

100.    The FARC initially involved itself in the cocaine and cocaine paste trade by imposing a "tax" on individuals involved in every aspect of cocaine and cocaine paste production that occurred within the territory it controlled, including, without limitation: coca farmers, cocaine lab operators, cocaine traffickers who received the finished cocaine for distribution, and individuals who ran clandestine air strips through which the cocaine was transported.

101.    The FARC's method of collecting the "taxes" on narcotics varied over time.  Initially, the FARC required the coca farmers located within its territories to bring the cocaine paste to FARC controlled markets on a weekly basis.  Cocaine and cocaine paste purchasers also arrived at the markets to purchase the cocaine paste.  At such markets, the FARC oversaw the narcotics transactions, "taxing" both the farmer and the purchaser for each gram of cocaine

23

paste sold.  Similarly, operators of cocaine laboratories had to pay "taxes" for each kilogram of cocaine produced.

## The FARC's Control of Cocaine Manufacturing And Distribution

102.    While continuing to "tax" all aspects of the cocaine trade, at the direction of its leaders, the FARC took a more active role in the production of cocaine paste and cocaine, to increase its income from the manufacture and distribution of cocaine to finance international terrorism.

103.    The FARC saw the control over the production of cocaine as means of furthering and funding its terrorist activities such as murder, extortion, kidnapping, bombing to destabilize Colombia and expert pressure and influence over the policies of Colombia and the U.S. as it moved into a counter narcotics and drug eradication program in Colombia.

104.    As it expanded its role, the FARC declared itself the sole buyer of cocaine paste in that Front or geographical area.  This practice was directed by the highest levels of the FARC - in order to increase the revenue the FARC derived from cocaine production in the areas that it controlled.

105.    The FARC leadership, having achieved a monopoly over cocaine paste purchases, then set the price at which it would buy cocaine paste from the campesinos.  The FARC required campesinos to bring the cocaine paste to markets that the FARC set up on a regular basis (e.g., once a week) where the campesinos would deliver the cocaine paste to the FARC. The FARC either paid the campesino at the time of the sale, or, more often, gave them a receipt which promised future payment.  The receipt indicated, among other things, the amount of cocaine paste purchased, the total amount owed to the campesino, a stamp stating

"FARC," and the name of the FARC Front that purchased the cocaine paste.

106.    Once the FARC purchased the cocaine paste, the paste was either: (a) sold at a price set by the FARC; or (b) brought to a laboratory run, controlled, or under the supervision of the FARC, where it was converted to cocaine.

107.    When the FARC sold the cocaine paste directly to a transporter, it typically delivered the cocaine paste to a laboratory which was either run by the FARC or by an independent, who was heavily "taxed" by the FARC, either in currency or in finished cocaine.

108.    When the FARC brought the cocaine paste to one of its own laboratories, it converted the cocaine paste to cocaine, and then delivered the drugs to the cocaine transportation organizations that sent the cocaine out of Colombia to the U.S. and elsewhere.  To facilitate these transactions, the FARC built, secured and operated clandestine air strips in its territories in Colombia and outside of Colombia's borders.

**The FARC's Coordinated Cocaine Trafficking and Strict Cocaine Policies**

109.    The various FARC Fronts coordinated their cocaine and cocaine paste manufacturing and distribution activities, depending on their geographical location and whether they had a local FARC cocaine conversion laboratory.  In addition, Fronts located on Colombia's borders were primarily responsible for transporting cocaine outside of Colombia, and facilitating the exchange of cocaine and cocaine paste for weapons and supplies that were used by the FARC to support their international terrorism activities.

110.    The FARC became directly involved in importation of cocaine into the United States and Europe, using its international membership in those countries to facilitate the receipt of FARC cocaine.  The FARC increased the quality of its cocaine for export, and established

25

direct ties with cocaine distribution organizations in the U.S. and Europe.

111.    The FARC's cocaine policies were enforced throughout the FARC.  FARC leaders stated that enforcement of FARC rules relating to cocaine and cocaine paste was of paramount importance, because the FARC was not able to finance its international terrorist operations without the money and weapons it earned through the cocaine and cocaine paste trade.  FARC leaders imposed a series of often lethal punishments, termed "Revolutionary Justice," on those who violated its cocaine and cocaine paste policies.

112.    FARC leaders ordered vast numbers of campesinos murdered for selling cocaine paste to non-FARC buyers.  Campesinos were also murdered for diluting the purity of the cocaine paste.  Campesinos were typically shot, stabbed, or dismembered alive.  Frequently, the bodies of the murdered campesinos were cut open, filled with rocks, and sunk in nearby rivers.  Other punishments of campesinos included the confiscation of their land for FARC coca plantations and forced exile from the area where they lived.

113.    Similarly, buyers who came into FARC territory without authorization and who purchased cocaine paste were summarily executed upon orders of the FARC leaders.  The FARC also murdered its own members who were caught stealing cocaine paste or cocaine.

### The FARC's Reliance On Illicit Income From Cocaine Manufacturing And Distribution and Targeting of Americans

114.    A 1997 publication that followed a FARC leadership meeting, made each Front primarily responsible for its own finances, and required each Front to pay tribute to the FARC leadership.  The FARC financed itself primarily through cocaine and cocaine paste manufacturing and distribution.  FARC Fronts that were able to produce greater revenue

through cocaine paste and cocaine production were responsible for contributing money and resources to support other Fronts that generated smaller revenues from the manufacture and distribution of cocaine paste and cocaine.   Narcotics proceeds were thus distributed throughout the FARC, for the enrichment of the commanders - Secretariat, Estado Mayor, Bloc, and Front - and in order to purchase weapons and supplies for all members of the FARC to continue their mission of international terrorism.

115.    FARC leadership frequently noted during meetings that the FARC could not survive without the proceeds generated from cocaine and cocaine paste manufacturing and distribution.   The FARC leadership recognized the damage to its finances caused by Colombia's government-sponsored fumigation efforts.

116.    The FARC leadership thus ordered its members to take counter-measures against fumigation, including, among others, shooting down fumigation aircraft; forcing campesinos to publicly rally against fumigation; and attacking Colombian infrastructure to force the Colombian Government to divert resources from fumigation.

117.    At all times material and before February 13, 2003 recognizing that the U.S. has contributed significantly to Colombian fumigation efforts, the FARC leadership ordered FARC members to kidnap and murder U.S. nationals to intimidate the U.S. and coerce it from efforts to fumigate and disrupt the FARC's cocaine and cocaine paste manufacturing and distribution activities.

## **FARC'S Designation as Foreign Terrorist Organization**

118.    On October 8, 1997 the Secretary of State of the United States, designated the FARC designated foreign terrorist organization (FTO), pursuant to Title 8, United States Code,

Section 1189.  The FARC was re-designated on September 5, 2001.  At all times material to this action, the FARC is a designated foreign terrorist organization.  As a result of this designation, it is unlawful for persons subject to the jurisdiction of the United States to provide material support and resources to the FARC.  Specifically, 8 U.S.C. § 1189(a)(1) authorizes the Secretary of State to designate an organization as a foreign terrorist organization . . . if the Secretary finds that (A) the organization is a foreign organization; (B) the organization engages in terrorist activity . . . ; and (C) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States. 8 U.S.C. § 1189(a)(1).

<u>**Object of the Conspiracy to Engage in Acts of International Terrorism**</u>

119.   Defendants and their co-conspirators engaged in and conspired to engage in acts of international terrorism and assist the FARC by establishing and personally serving in a finance, money laundering, logistical, support and supply network designed to procure weapons, ammunition, high technology devices, money, and other materials and supplies, and to transport and deliver these and other commodities, including hostages, to and among the FARC all in furtherance of international terrorism, terrorism, terrorist activity and including murder and hostage taking of U.S. nationals.

120.   Defendants knowingly and intentionally combined, confederated, conspired and agreed with each other and with other co-conspirators, known and unknown, to seize and detain and threaten to kill, injure and continue to detain U.S. nationals and other nationals working in Colombia in order to intimidate and coerce the U.S. Government and that the government of Colombia exchange prisoners with the FARC and create a demilitarized zone

for the FARC, as explicit and implicit conditions for the release of the U.S. nationals and other hostages.

### Acts of International Terrorism

121.    The defendants conspired to unlawfully import cocaine into the U.S. and use the funds from its manufacture and distribution to materially support international terrorism and a foreign terrorist organization FARC.

122.    The defendants produced, manufactured and distributed cocaine, and coca leaves, intending and knowing that such controlled substance would be unlawfully imported into the U.S. and for the purpose of materially supporting international terrorism and a foreign terrorist organization FARC.

123.    Defendants found buyers for and then transported by air for profit, via clandestine airstrips located in Colombia and Venezuela, cocaine produced Colombia.

124.    Defendants exchanged cocaine for materials and supplies, including weapons, ammunition, and satellite phones for the FARC to directly support hostage taking and hostage maintenance.

125.    Defendants used profits from the sale of cocaine to procure communications equipment purchased in the United States, such as satellite telephones, SIM cards, and other high technology devices, HF radios and then used this equipment to operate the logistical supply network to directly support hostage taking and hostage maintenance.

126.    Defendants used satellite telephones and HF radios, and radio call centers to communicate with each other in order to facilitate the procurement and shipment of supplies intended for the FARC, and to facilitate the transfer of funds to purchase or transport supplies

intended for the FARC to directly support hostage taking and hostage maintenance.

127.    Defendants had materials and supplies shipped from various urban areas within Colombia and from other countries, including the U.S. to covert supply routes -  flying materials on twin engine planes, such as DC-3s, to rural and jungle airstrips in areas influenced or controlled by the FARC, whereupon they were transported to FARC camps via truck or river boat.  FARC members also delivered large sums of cash to finance the purchase of materials and supplies to directly support hostage taking and hostage maintenance.

128.    Defendants CESAR and DORIS ADRIANA were among the leaders of the FARC who committed acts of international terrorism and further the conspiracy to commit such acts including material support of the FARC.  CESAR was the commander of the 550 person 1st Front.  DORIS ADRIANA was the 1st Front's fourth ranking member and is in charge of the logistical and finance network.  She was responsible for not only supplying the 1st Front with materials and supplies, including high technology communications equipment, but also with supplying other fronts with high technology communications equipment and other materials and supplies to directly support hostage taking and hostage maintenance.

129.    Defendants CESAR controlled all cocaine production, manufacture, and distribution in his geographical area – 1st Front.  No activity of any kind occurred in the 1st Front's geographic area without his complete control and approval.

130.    Defendant DORIS ADRIANA used her logistical and finance network to supply the FARC with material items.  Operating from FARC-controlled rural and jungle areas where no land line or cellular phone service was available, she communicated with other members of the network located in urban areas by:

(i)      satellite phones purchased from telecommunications companies located in Florida and/or Bogota, Colombia, to communicate directly with her network in order to purchase materials and supplies, to arrange for the purchase of materials and supplies, to arrange for the transport of materials and supplies, and to arrange for the transfer of funds to pay for the purchase of materials and supplies to directly support hostage taking and hostage maintenance;

(ii)     Call centers in Colombia's urban areas to patch through calls to members of her logistical network.  Call centers are communications businesses that had the technology to receive calls from rural and jungle areas via HF radios, and then patch those calls through to land lines and cell phones located in any other urban area in Colombia or in other countries, including the United States to directly support hostage taking and hostage maintenance.

131.    Defendants would prepare fraudulent air shipment manifests or bribe airport or airline employees to fraudulently ship material items to the FARC.

132.    Defendants sold or traded cocaine in exchange for rifles, rifle scopes, pistols, shotguns, bomb fuses, and ammunition to directly U.S. national murder, hostage taking and hostage maintenance.

133.    The FARC and all defendants committed acts of international terrorism and furthered the conspiracy to commit such acts including material support of the FARC and:

a)  targeted American persons and companies;

b)  engaged in 2 way radio communications to inform each other about the presence of the Plaintiffs' aircraft in the area of the FARC's Teofilo Forrero Mobile Column's area of operations;

c)  obtained permission to attack the aircraft which Defendants knew carried U.S. nationals;

d)  attacked the aircraft using firearms and seized as hostages U.S. nationals once the aircraft had crash landed;

e)   shot and killed a U.S. national  - pilot of the downed aircraft;

f)   shot and killed a Colombian soldier who was part of the crew of the downed aircraft;

g)   forced the plaintiffs away from the aircraft crash site using armed force and deadly force and took them hostage;

h)   repeatedly transported the plaintiffs to remote areas away from the site of the hostage taking using armed force and deadly force, with their necks chained for long marches through dense jungle terrain;

i)   detained the hostages under armed guard and threat of death at various locations in the jungle;

j)   assigned specific FARC members to execute plaintiffs in the event a rescue attempt was committed;

k)   performed sadistic jungle medical procedures on plaintiffs when they were injured;

l)   starved the plaintiffs for long periods;

m)  chained the plaintiffs with truck chains;

n)   demanded that the Colombian government create a demilitarized zone and conduct an exchange of prisoners with the FARC as explicit conditions for the release of the plaintiffs/hostages;

o)   prepared and published forced proof of life videos which were aired in the United States;

p)   named senior commanders, with expertise in negotiations to represent the FARC in negotiations with the Colombian government for the release of U.S.

32

plaintiffs/hostages held by the FARC;

q) obtained false and fraudulent identification documents to facilitate participation in the negotiations of FARC demands for release of the U.S. plaintiffs/hostages;

r) concealed the location of the plaintiffs/hostages;

s) subjected the plaintiffs/hostages to cruel and inhumane conditions resulting in disease, illness, mental and physical injury and trauma;

t) denied the plaintiffs/hostages adequate food and medical care;

u) solicited and received material support from various persons and foreign companies doing business in Colombia, and other countries outside of Colombia, including payment of protection money, and supplies, transportation, logistics, medical care and treatment for FARC terrorists;

v) solicited and received financial support from various foreign banks and non-bank financial institutions, money launderers, money changers, foreign citizens and persons of interest, non governmental groups and charities, front companies including money laundering of proceeds of the FARC's criminal activities, and other banking and financial transaction services to support the FARC's ongoing hostage taking, captivity and narcotics trafficking activities;

w) availed itself of the U.S. banking system through foreign banks, non bank financial institutions, money changers and launderers, U.S. and foreign persons with foreign accounts or privileges to use clearing accounts to send, direct, divert, and disguise, financial support for terrorist activities, murder, hostage taking, support of hostages in captivity and the terrorist who guard the hostages, operate

communications and shadow local governments, and establish logistics and supply lines for illegal activities, including narcotics trafficking.

### The February 13, 2003 Mission, Armed Engagement, Murders and Hostage Taking

134.    On February 13, 2003, members of the designated foreign terrorist organization FARC opened fire on a U.S. registered aircraft as it was flying over southern Colombia on a counter narcotics surveillance mission.  Four U.S. nationals and one Colombian soldier were aboard.

135.    All five mission crew survived the crash-landing, but were immediately taken captive by FARC terrorists who continued to fire weapons on the aircraft and crew of the downed plane.   The U.S. national pilot, Thomas Janis, and the Colombian soldier, Luis Alcides Cruz, were shot and killed by FARC members shortly after the crash landing, and their bodies were left a short distance from the damaged plane.   The other three U.S. nationals, Thomas Howes, Keith Stansell and Marc Gonsalves, were seized and taken into the jungle by FARC members, where they were marched at gunpoint, hidden, and held hostage for 1,967 days until their rescue July 2, 2008.

### The FARC Taking Credit for the Hostage Taking and Murders

136.    Tom Janis' body was found near the crash site.   Captured FARC members have admitted that the FARC murdered Tom Janis and Luis Cruz.

137.    About two months after the plane crash, on April 27, 2003, the FARC issued a public communique acknowledging that it had taken the three U.S. nationals hostage, erroneously referring to them as "three members of the United States military."   In that public letter, the FARC offered to release approximately 250 high level Colombian citizens that it was then

holding hostage,[2] together with the three Americans captured on February 13, 2003, in exchange for certain political concessions from the Colombian government.  Specifically, the FARC demanded that the Colombian government carve out of its sovereign territory a demilitarized zone (DMZ), which would be used as a new base of operations for the FARC, and release hundreds of FARC terrorists currently held by the Colombian authorities, as a condition for the release of the three American hostages.

138.    The April 27th FARC communique also called on the Colombian government to name an official representative to participate in "prisoner exchange" negotiations with the FARC. The communiqué identified three FARC senior commanders who had agreed to serve as representatives for the FARC in these negotiations, one of whom was the defendant, Simon Trinidad.

139.    In July 2003, the defendants forced the plaintiffs, Keith Stansell, Marc Gonsalves, and Thomas Howes to participate in a videotaped interview to prove that they were alive and being held by the defendants.  A FARC senior leader and defendant here, Mono Jojoy, told the plaintiffs, Keith Stansell, Marc Gonsalves, and Thomas Howes that the FARC Commander "has ordered us . . . to send a proof of life to your families."  The plaintiffs' families lived inside the United States.  The "proof of life" was delivered to CBS News, an American media organization, in New York, New York and aired throughout the United States, including in this district.

140.    On January 2, 2004, defendant Trinidad was arrested in Quito, Equador as an illegal

---

[2] At the time, the FARC hostages included provincial governors (2-4), national legislators (10-15), military officers (100+), police officials (100+), and other foreign nationals who had been captured by the FARC.

alien.   At his deportation hearing, Trinidad admitted that he was an active member of the FARC and that he had entered Ecuador illegally to obtain false identification documents in order to enable him to travel abroad to participate as a FARC representative in negotiations for the exchange of FARC held hostages for FARC members held by the Colombian government.   Later, after waiving his rights, Trinidad repeated these same admissions to FBI agents during custodial interviews in Colombia.

141.   An illegal organization like the FARC cannot realize any political benefit from taking people hostage -- such as the creation of a DMZ or the release of FARC terrorists held in Colombian prisons -- without an official representative who is willing to serve as their trusted agent in negotiations with the Colombian government, and who has the position and authority to dictate the terms under which the FARC will or will not release its hostages.   Defendant Trinidad served as the FARC's official representative until the day of his arrest, January 2, 2004.

142.   For his role in the hostage-taking conspiracy involving the three U.S. national plaintiffs/hostages, defendant Trinidad was convicted by a jury in federal court in the District of Columbia for Conspiracy to Commit Hostage-Taking, in violation of 18 U.S.C. § 1203, which conviction was upheld on appeal.   The evidence at trial showed that the defendant joined a conspiracy to take Americans hostages in Colombia.   It further showed that the FARC fired their weapons at the victims' plane.   The FARC's capture of the five occupants of the plane, and their shooting and killing of two of them, were parts of that conspiracy, and were specifically charged as overt acts in the indictment, Count One, ¶ 12(e) (f).

143.     FARC control of illegal cocaine production in Colombia and its distribution to the

U.S. is a source of material support for its terrorist activities worldwide and directly caused

and was a source of the FARC's support and logistics infrastructure to capture, hold hostage

and deny freedom to the three plaintiffs Keith Stansell, Marc Gonsalves, and Tom Howes.

This illegal narcotics production and international distribution directly caused and was a

source of the material support and logistics necessary to the act of international terrorism –

the murder of Tom Janis a U.S. national, husband and father.

144.     The FARC and its members' terrorist acts including the murder of Thomas Janis and

hostage taking of Keith Stansell, Marc Gonsalves, and Thomas Howes was a result of the

FARC's illegal activities including terrorism, efforts to destabilize a democratic nation –

Colombia, to illegally influence U.S policy in the region, and project its terror directly into

the U.S.

145.     Pursuant to federal grand jury indictment, Defendants have earned over $25 billion of

U.S. currency as a result of their ongoing narco-trafficking activities, and are material support

of international terrorism and enabled the defendants and other as yet unknown, to murder

Tom Janis and hold hostage Keith Stansell, Marc Gonsalves, and Tom Howes.

### COUNT ONE
**(Keith Stansell against all defendants)**
**18 U.S.C. § 2333**

146.     Plaintiff adopts and incorporates the allegations and facts contained in prior

paragraphs and in allegations common to all counts.

147.     Plaintiff Keith Stansell is a U.S. national injured by reason of an act of international

terrorism and seeks damages under 18 U.S.C. § 2333.

148.    Plaintiff was victimized by acts of "international terrorism" as defined by 18 U.S.C. §

2331(1) which states:

> **"(1)** the term "international terrorism" means activities that--
>
>> **(A)** involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>>
>> **(B)** appear to be intended--
>>> **(i)** to intimidate or coerce a civilian population;
>>> **(ii)** to influence the policy of a government by intimidation or coercion; or
>>> **(iii)** to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>>
>> **(C)** occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

149.    On February 13, 2003, members of the FARC opened fire on a U.S. registered aircraft

as it was flying over southern Colombia on a counter-narcotics surveillance mission.   The

plane was crewed by four U.S. nationals employed by California Microwave Systems (a

subsidiary of Northrop Grumman), and one Colombian soldier.  Plaintiff Keith Stansell was

the mission commander on board the aircraft on February 13, 2003.

150.    All five occupants of the plane survived a crash-landing, but were immediately taken

captive by FARC terrorists who quickly located and continued to fire automatic weapons on

the aircraft and crew of the downed plane.  The U.S national pilot, Thomas Janis, and the

Colombian soldier, Luis Alcides Cruz, were shot and killed by FARC members shortly after

the crash landing, and their bodies were left a short distance from the damaged plane.  Keith

Stansell was seized, detained, threatened to be killed, taken into the jungle by FARC members, where he was tortured, chained, starved, denied his liberty, hidden and forced at gun point to march throughout Colombia and other areas for more than 5 years – 1,967 days until he was rescued on July 2, 2008.

151.    Defendant, REVOLUTIONARY ARMED FORCES OF COLOMBIA ("FARC"), or in Spanish FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, is a designated foreign terrorist organization pursuant to Title 8, United States Code, Section 1189 originally designated on October 8, 1997 and re-designated on September 5, 2001 and committed these acts directly against the plaintiff Keith Stansell injuring him.

152.    Individual defendants committed these acts directly against plaintiff Keith Stansell injuring him or conspired to commit acts to provide  logistics, financing, safe houses and safe havens, transportation, communications, funds, transfer of funds, other in kind material benefit, false documentation or identification including alias names, weapons, explosives, non-medical training, ammunition, and chemicals required to produce cocaine to further terrorist activity of the terrorist organization FARC.

153.    Defendants kidnapped, held hostage, tortured, and murdered Plaintiffs and/or knowingly aided and abetted or conspired to provide material support to the perpetrators of such acts. Defendants also aided, abetted, conspired, or otherwise engaged in or provided material support for the acts of international terrorism, including but not limited to providing material support and/or aiding and abetting assistance to the FARC.  This material support and/or aiding and abetting of acts of international terrorism allowed Defendants to carry out the kidnapping, torture, and wrongful death of Plaintiffs and specifically Keith Stansell.

154.    Defendants specifically targeted U.S nationals as terrorist targets, shot down a U.S. registered aircraft performing a counter-narcotics mission, then murdered its pilot Tom Janis, and kidnapped and held hostage Plaintiffs Keith Stansell, Marc Gonsalves and Tom Howes. Non-voluntary proof of life videotapes were created, communicated, and published in the United States for demands for demilitarized zones and prisoner exchanges.  Defendants claimed responsibility for the murders and hostage taking.  Defendants held Keith Stansell hostage for more than five years.

155.    Defendants' activities involved violent and dangerous acts to human life that were, and are, a violation of the criminal laws of the United States or of any State.

156.    Defendants' acts were intended to intimidate or coerce the Colombian and United States civilian population, to influence policy of the U.S. Government by intimidation or coercion, and to affect the conduct of a government by kidnapping, hostage taking and assassination.

157.    Defendants' activities occurred outside the territorial jurisdiction of the United States and transcend international boundaries.

158.    Defendants' acts are therefore acts of international terrorism as defined under 18 U.S.C. §2331 and §2333.

159.    Defendants' acts and their participation in the terrorist conspiracy are "terrorism" and "terrorist activity" under 18 U.S.C. §2339.

160.    Defendants intentionally and purposefully hid and concealed their true identities, physical whereabouts and their involvement in the FARC terrorist activities, including hostage taking, kidnapping, killing and imprisoning Plaintiffs.

161.    As a terrorist organization, or as members of a terrorist organization and criminal

conspiracy, defendants are all terrorist parties who proximately caused the death and injuries

described herein and are all jointly and severally liable for the terrorist acts, including acts of

international terrorism, the aiding and abetting of international terrorism, conspiring to

commit further acts of international terror, engaging in a joint single enterprise to conduct

international terrorism through illegal schemes, and/or the material support and sponsorship

of international terrorism.

**WHEREFORE**, Plaintiff, Keith Stansell, demands judgment in his favor against all

defendants, jointly and severally, for his past and future physical and mental pain and

suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life,

emotional distress, loss of five and a half years of his life, including treble damages under 18

U.S.C. 2333, plus interest, costs, attorneys fees, and such other monetary and equitable relief

as this Honorable Court deems appropriate to compensate plaintiff.

## COUNT TWO
### (Marc Gonsalves against all defendants)
### 18 U.S.C. § 2333

162.    Plaintiff adopts and incorporates the allegations and facts contained in prior

paragraphs and in allegations common to all counts.

163.    Plaintiff Marc Gonsalves is a U.S. national injured by reason of an act of international

terrorism and seeks damages under 18 U.S.C. § 2333.

164.    Plaintiff was victimized by acts of "international terrorism" as defined by 18 U.S.C. §

2331(1) which states:

**"(1)** the term "international terrorism" means activities that--

41

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended--
    (i) to intimidate or coerce a civilian population;
    (ii) to influence the policy of a government by intimidation or coercion; or
    (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

165. On February 13, 2003, members of the FARC opened fire on a U.S. registered aircraft as it was flying over southern Colombia on a counter-narcotics surveillance mission. The plane was crewed by four U.S. nationals employed by California Microwave Systems (a subsidiary of Northrop Grumman), and one Colombian soldier. Plaintiff Marc Gonsalves was the chief counter narcotics analyst on board the aircraft on February 13, 2003.

166. All five occupants of the plane survived a crash-landing, but were immediately taken captive by FARC terrorists who quickly located and continued to fire automatic weapons on the aircraft and crew of the downed plane. The U.S national pilot, Thomas Janis, and the Colombian soldier, Luis Alcides Cruz, were shot and killed by FARC members shortly after the crash landing, and their bodies were left a short distance from the damaged plane. Marc Gonsalves was seized, detained, threatened to be killed, taken into the jungle by FARC members, where he was tortured, chained, starved, denied his liberty, hidden and forced at

42

gun point to march throughout Colombia and other areas for more than 5 years – 1,967 days until he was rescued on July 2, 2008.

167.    Defendant, REVOLUTIONARY ARMED FORCES OF COLOMBIA ("FARC"), or in Spanish FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, is a designated foreign terrorist organization pursuant to Title 8, United States Code, Section 1189 originally designated on October 8, 1997 and re-designated on September 5, 2001 and committed these acts directly against the plaintiff Marc Gonsalves injuring him.

168.    Individual defendants committed these acts directly against plaintiff Marc Gonsalves injuring him or conspired to commit acts to provide  logistics, financing, safe houses and safe havens, transportation, communications, funds, transfer of funds, other in kind material benefit, false documentation or identification including alias names, weapons, explosives, non-medical training, ammunition, and chemicals required to produce cocaine to further terrorist activity of the terrorist organization FARC.

169.    Defendants kidnapped, held hostage, tortured, and murdered Plaintiffs and/or knowingly aided and abetted or conspired to provide material support to the perpetrators of such acts. Defendants also aided, abetted, conspired, or otherwise engaged in or provided material support for the acts of international terrorism, including but not limited to providing material support and/or aiding and abetting assistance to the FARC.  This material support and/or aiding and abetting of acts of international terrorism allowed Defendants to carry out the kidnapping, torture, and wrongful death of Plaintiffs and specifically Marc Gonsalves.

170.    Defendants specifically targeted U.S nationals as terrorist targets, shot down a U.S. registered aircraft performing a counter-narcotics mission, then murdered its pilot Tom Janis,

and kidnapped and held hostage Plaintiffs Keith Stansell, Marc Gonsalves and Tom Howes. Non-voluntary proof of life videotapes were created, communicated, and published in the United States for demands for demilitarized zones and prisoner exchanges. Defendants claimed responsibility for the murders and hostage taking. Defendants held Marc Gonsalves hostage for more than five years.

171.    Defendants' activities involved violent and dangerous acts to human life that were, and are, a violation of the criminal laws of the United States or of any State.

172.    Defendants' acts were intended to intimidate or coerce the Colombian and United States civilian population, to influence policy of the U.S. Government by intimidation or coercion, and to affect the conduct of a government by kidnapping, hostage taking and assassination.

173.    Defendants' activities occurred outside the territorial jurisdiction of the United States and transcend international boundaries.

174.    Defendants' acts are therefore acts of international terrorism as defined under 18 U.S.C. §2331 and §2333.

175.    Defendants' acts and their participation in the terrorist conspiracy are "terrorism" and "terrorist activity" under 18 U.S.C. §2339.

176.    Defendants intentionally and purposefully hid and concealed their true identities, physical whereabouts and their involvement in the FARC terrorist activities, including hostage taking, kidnapping, killing and imprisoning Plaintiffs.

177.    As a terrorist organization, or as members of a terrorist organization and criminal conspiracy, defendants are all terrorist parties who proximately caused the death and injuries

44

described herein and are all jointly and severally liable for the terrorist acts, including acts of international terrorism, the aiding and abetting of international terrorism, conspiring to commit further acts of international terror, engaging in a joint single enterprise to conduct international terrorism through illegal schemes, and/or the material support and sponsorship of international terrorism.

**WHEREFORE**, Plaintiff, Marc Gonsalves, demands judgment in his favor against all defendants, jointly and severally, for his past and future physical and mental pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, emotional distress, loss of five and a half years of his life, including treble damages under 18 U.S.C. 2333, plus interest, costs, attorneys fees, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate plaintiff.

<u>**COUNT THREE**</u>
**(Thomas Howes against all defendants)**
**18 U.S.C. § 2333**

178.    Plaintiff adopts and incorporates the allegations and facts contained in prior paragraphs and in allegations common to all counts.

179.    Plaintiff Thomas Howes is a U.S. national injured by reason of an act of international terrorism and seeks damages under 18 U.S.C. § 2333.

180.    Plaintiff was victimized by acts of "international terrorism" as defined by 18 U.S.C. § 2331(1) which states:

"**(1)** the term "international terrorism" means activities that--

**(A)** involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or

that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(**B**) appear to be intended--
> (**i**) to intimidate or coerce a civilian population;
> (**ii**) to influence the policy of a government by intimidation or coercion; or
> (**iii**) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(**C**) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

181.    On February 13, 2003, members of the FARC opened fire on a U.S. registered aircraft as it was flying over southern Colombia on a counter-narcotics surveillance mission.   The plane was crewed by four U.S. nationals employed by California Microwave Systems (a subsidiary of Northrop Grumman), and one Colombian soldier.  Plaintiff Thomas Howes was one of the pilots flying the aircraft on February 13, 2003.

182.    All five occupants of the plane survived a crash-landing, but were immediately taken captive by FARC terrorists who quickly located and continued to fire automatic weapons on the aircraft and crew of the downed plane.  The U.S national pilot, Thomas Janis, and the Colombian soldier, Luis Alcides Cruz, were shot and killed by FARC members shortly after the crash landing, and their bodies were left a short distance from the damaged plane. Thomas Howes was seized, detained, threatened to be killed, taken into the jungle by FARC members, where he was tortured, chained, starved, denied his liberty, hidden and forced at gun point to march throughout Colombia and other areas for more than 5 years – 1,967 days until he was rescued on July 2, 2008.

183.    Defendant, REVOLUTIONARY ARMED FORCES OF COLOMBIA ("FARC"), or in Spanish FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, is a designated foreign terrorist organization pursuant to Title 8, United States Code, Section 1189 originally designated on October 8, 1997 and re-designated on September 5, 2001 and committed these acts directly against the plaintiff Thomas Howes injuring him.

184.    Individual defendants committed these acts directly against plaintiff Thomas Howes injuring him or conspired to commit acts to provide  logistics, financing, safe houses and safe havens, transportation, communications, funds, transfer of funds, other in kind material benefit, false documentation or identification including alias names, weapons, explosives, non-medical training, ammunition, and chemicals required to produce cocaine to further terrorist activity of the terrorist organization FARC.

185.    Defendants kidnapped, held hostage, tortured, and murdered Plaintiffs and/or knowingly aided and abetted or conspired to provide material support to the perpetrators of such acts. Defendants also aided, abetted, conspired, or otherwise engaged in or provided material support for the acts of international terrorism, including but not limited to providing material support and/or aiding and abetting assistance to the FARC.  This material support and/or aiding and abetting of acts of international terrorism allowed Defendants to carry out the kidnapping, torture, and wrongful death of Plaintiffs and specifically Thomas Howes.

186.    Defendants specifically targeted U.S nationals as terrorist targets, shot down a U.S. registered aircraft performing a counter-narcotics mission, then murdered its pilot Tom Janis, and kidnapped and held hostage Plaintiffs Keith Stansell, Marc Gonsalves and Tom Howes. Non-voluntary proof of life videotapes were created, communicated, and published in the

United States for demands for demilitarized zones and prisoner exchanges.  Defendants

claimed responsibility for the murders and hostage taking.  Defendants held Thomas Howes

hostage for more than five years.

187.    Defendants' activities involved violent and dangerous acts to human life that were,

and are, a violation of the criminal laws of the United States or of any State.

188.    Defendants' acts were intended to intimidate or coerce the Colombian and United

States civilian population, to influence policy of the U.S. Government by intimidation or

coercion, and to affect the conduct of a government by kidnapping, hostage taking and

assassination.

189.    Defendants' activities occurred outside the territorial jurisdiction of the United States

and transcend international boundaries.

190.    Defendants' acts are therefore acts of international terrorism as defined under 18

U.S.C. §2331 and §2333.

191.    Defendants' acts and their participation in the terrorist conspiracy are "terrorism" and

"terrorist activity" under 18 U.S.C. §2339.

192.    Defendants intentionally and purposefully hid and concealed their true identities,

physical whereabouts and their involvement in the FARC terrorist activities, including

hostage taking, kidnapping, killing and imprisoning Plaintiffs.

193.    As a terrorist organization, or as members of a terrorist organization and criminal

conspiracy, defendants are all terrorist parties who proximately caused the death and injuries

described herein and are all jointly and severally liable for the terrorist acts, including acts of

international terrorism, the aiding and abetting of international terrorism, conspiring to

commit further acts of international terror, engaging in a joint single enterprise to conduct international terrorism through illegal schemes, and/or the material support and sponsorship of international terrorism.

WHEREFORE, Plaintiff, Thomas Howes, demands judgment in his favor against all defendants, jointly and severally, for his past and future physical and mental pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, emotional distress, loss of five and a half years of his life, including treble damages under 18 U.S.C. 2333, plus interest, costs, attorneys fees, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate plaintiff.

### COUNT FOUR
### (Judith Janis against all defendants)
### 18 U.S.C. § 2333

194.   Plaintiff adopts and incorporates the allegations and facts contained in prior paragraphs and in allegations common to all counts.

195.   Plaintiff Judith Janis is a U.S. national injured by reason of an act of international terrorism and seeks damages under 18 U.S.C. § 2333.  Judith Janis' husband Thomas Janis was murdered by the defendants.

196.   Plaintiff was victimized by acts of "international terrorism" as defined by 18 U.S.C. § 2331(1) which states:

"(1) the term "international terrorism" means activities that--

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

49

          **(B)** appear to be intended--
               **(i)** to intimidate or coerce a civilian population;
               **(ii)** to influence the policy of a government by intimidation or coercion; or
               **(iii)** to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

          **(C)** occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

197.    On February 13, 2003, members of the FARC opened fire on a U.S. registered aircraft as it was flying over southern Colombia on a counter-narcotics surveillance mission.   The plane was crewed by four U.S. nationals employed by California Microwave Systems (a subsidiary of Northrop Grumman), and one Colombian soldier.  Plaintiff Thomas Janis was pilot and aircraft commander on board the aircraft on February 13, 2003.

198.    All five occupants of the plane survived a crash-landing, but were immediately taken captive by FARC terrorists who quickly located and continued to fire automatic weapons on the aircraft and crew of the downed plane.  The U.S national pilot, Thomas Janis, was captured and then shot and killed by FARC members shortly after the crash landing, and his body left a short distance from the damaged plane.

199.    Defendant, REVOLUTIONARY ARMED FORCES OF COLOMBIA ("FARC"), or in Spanish FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, is a designated foreign terrorist organization pursuant to Title 8, United States Code, Section 1189 originally designated on October 8, 1997 and re-designated on September 5, 2001 and committed these acts directly against the plaintiff Judith Janis, by killing her husband Thomas Janis.

200.     Individual defendants committed these acts directly against plaintiff Judith Janis

injuring her or conspired to commit acts to provide  logistics, financing, safe houses and safe

havens, transportation, communications, funds, transfer of funds, other in kind material

benefit, false documentation or identification including alias names, weapons, explosives,

non-medical training, ammunition, and chemicals required to produce cocaine to further

terrorist activity of the terrorist organization FARC.

201.     Defendants murdered Thomas Janis and/or knowingly aided and abetted or conspired to

provide material support to the perpetrators of such acts.  Defendants also aided, abetted,

conspired, or otherwise engaged in or provided material support for the acts of international

terrorism, including but not limited to providing material support and/or aiding and abetting

assistance to the FARC.  This material support and/or aiding and abetting of acts of international

terrorism allowed defendants to carry out the kidnapping, torture, and wrongful death of

plaintiffs and specifically Thomas Janis.

202.     Defendants specifically targeted U.S nationals as terrorist targets, shot down a U.S.

registered aircraft performing a counter-narcotics mission, then murdered its pilot Tom Janis,

murdered the Colombian soldier Luis Alcides Cruz and kidnapped and held hostage plaintiffs

Keith Stansell, Marc Gonsalves and Tom Howes.  Non-voluntary proof of life videotapes

were created, communicated, and published in the United States for demands for

demilitarized zones and prisoner exchanges.  Defendants claimed responsibility for the

murders and hostage taking.

203.     Defendants' activities involved violent and dangerous acts to human life that were,

and are, a violation of the criminal laws of the United States or of any State.

204.    Defendants' acts were intended to intimidate or coerce the Colombian and United States civilian population, to influence policy of the U.S. Government by intimidation or coercion, and to affect the conduct of a government by kidnapping, hostage taking and assassination.

205.    Defendants' activities occurred outside the territorial jurisdiction of the United States and transcend international boundaries.

206.    Defendants' acts are therefore acts of international terrorism as defined under 18 U.S.C. §2331 and §2333.

207.    Defendants' acts and their participation in the terrorist conspiracy are "terrorism" and "terrorist activity" under 18 U.S.C. §2339.

208.    Defendants intentionally and purposefully hid and concealed their true identities, physical whereabouts and their involvement in the FARC terrorist activities, including hostage taking, kidnapping, killing and imprisoning Plaintiffs.

209.    As a terrorist organization, or as members of a terrorist organization and criminal conspiracy, defendants are all terrorist parties who proximately caused the death and injuries described herein and are all jointly and severally liable for the terrorist acts, including acts of international terrorism, the aiding and abetting of international terrorism, conspiring to commit further acts of international terror, engaging in a joint single enterprise to conduct international terrorism through illegal schemes, and/or the material support and sponsorship of international terrorism.

**WHEREFORE**, Plaintiff, Judith Janis, demands judgment against all defendants, jointly and severally, for her past and future mental pain and suffering, anguish, emotional

distress, loss of solatium, loss of companionship, society, affection, consortium and

guidance, including treble damages under 18 U.S.C. 2333, plus interest, costs, attorneys fees,

and such other monetary and equitable relief as this Honorable Court deems appropriate to

compensate plaintiff.

### COUNT FIVE
**(Christopher T. Janis against all defendants)**
**18 U.S.C. § 2333**

210.    Plaintiff adopts and incorporates the allegations and facts contained in prior

paragraphs and in allegations common to all counts.

211.    Plaintiff Christopher T. Janis is a U.S. national injured by reason of an act of

international terrorism and seeks damages under 18 U.S.C. § 2333.  Christopher Janis' father

Thomas Janis was murdered by defendants.

212.    Plaintiff was victimized by acts of "international terrorism" as defined by 18 U.S.C. §

2331(1) which states:

> **"(1)** the term "international terrorism" means activities that--
>
> > **(A)** involve violent acts or acts dangerous to human life that are a
> > violation of the criminal laws of the United States or of any State, or
> > that would be a criminal violation if committed within the jurisdiction
> > of the United States or of any State;
> >
> > **(B)** appear to be intended--
> > > **(i)** to intimidate or coerce a civilian population;
> > > **(ii)** to influence the policy of a government by intimidation or
> > > coercion; or
> > > **(iii)** to affect the conduct of a government by mass destruction,
> > > assassination, or kidnapping; and
> >
> > **(C)** occur primarily outside the territorial jurisdiction of the United
> > States, or transcend national boundaries in terms of the means by
> > which they are accomplished, the persons they appear intended to

>intimidate or coerce, or the locale in which their perpetrators operate
>or seek asylum."

213.    On February 13, 2003, members of the FARC opened fire on a U.S. registered aircraft

as it was flying over southern Colombia on a counter-narcotics surveillance mission.   The

plane was crewed by four U.S. nationals employed by California Microwave Systems (a

subsidiary of Northrop Grumman), and one Colombian soldier.  Plaintiff Thomas Janis was

pilot and aircraft commander on board the aircraft on February 13, 2003.

214.    All five occupants of the plane survived a crash-landing, but were immediately taken

captive by FARC terrorists who quickly located and continued to fire automatic weapons on

the aircraft and crew of the downed plane.  The U.S national pilot, Thomas Janis, was

captured and then shot and killed by FARC members shortly after the crash landing, and his

body left a short distance from the damaged plane.

215.    Defendant, REVOLUTIONARY ARMED FORCES OF COLOMBIA ("FARC"), or

in Spanish FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, is a designated

foreign terrorist organization pursuant to Title 8, United States Code, Section 1189 originally

designated on October 8, 1997 and re-designated on September 5, 2001 and committed these

acts directly against the plaintiff Christopher Janis, by killing his father Thomas Janis.

216.    Individual defendants committed these acts directly against plaintiff Christopher T.

Janis injuring him by killing his father Thomas Janis or conspired to commit acts to provide

logistics, financing, safe houses and safe havens, transportation, communications, funds,

transfer of funds, other in kind material benefit, false documentation or identification

including alias names, weapons, explosives, non-medical training, ammunition, and

chemicals required to produce cocaine to further terrorist activity of the terrorist organization FARC.

217.     Defendants murdered Thomas Janis and/or knowingly aided and abetted or conspired to provide material support to the perpetrators of such acts.  Defendants also aided, abetted, conspired, or otherwise engaged in or provided material support for the acts of international terrorism, including but not limited to providing material support and/or aiding and abetting assistance to the FARC.  This material support and/or aiding and abetting of acts of international terrorism allowed defendants to carry out the kidnapping, torture, and wrongful death of plaintiffs and specifically Thomas Janis.

218.     Defendants specifically targeted U.S nationals as terrorist targets, shot down a U.S. registered aircraft performing a counter-narcotics mission, then murdered its pilot Tom Janis, murdered the Colombian soldier Luis Alcides Cruz and kidnapped and held hostage plaintiffs Keith Stansell, Marc Gonsalves and Tom Howes.  Non-voluntary proof of life videotapes were created, communicated, and published in the United States for demands for demilitarized zones and prisoner exchanges.  Defendants claimed responsibility for the murders and hostage taking.

219.     Defendants' activities involved violent and dangerous acts to human life that were, and are, a violation of the criminal laws of the United States or of any State.

220.     Defendants' acts were intended to intimidate or coerce the Colombian and United States civilian population, to influence policy of the U.S. Government by intimidation or coercion, and to affect the conduct of a government by kidnapping, hostage taking and assassination.

221.    Defendants' activities occurred outside the territorial jurisdiction of the United States and transcend international boundaries.

222.    Defendants' acts are therefore acts of international terrorism as defined under 18 U.S.C. §2331 and §2333.

223.    Defendants' acts and their participation in the terrorist conspiracy are "terrorism" and "terrorist activity" under 18 U.S.C. §2339.

224.    Defendants intentionally and purposefully hid and concealed their true identities, physical whereabouts and their involvement in the FARC terrorist activities, including hostage taking, kidnapping, killing and imprisoning Plaintiffs.

225.    As a terrorist organization, or as members of a terrorist organization and criminal conspiracy, defendants are all terrorist parties who proximately caused the death and injuries described herein and are all jointly and severally liable for the terrorist acts, including acts of international terrorism, the aiding and abetting of international terrorism, conspiring to commit further acts of international terror, engaging in a joint single enterprise to conduct international terrorism through illegal schemes, and/or the material support and sponsorship of international terrorism.

   **WHEREFORE**, Plaintiff, Christopher T. Janis, demands judgment against all defendants, jointly and severally, for his past and future mental pain and suffering, anguish, emotional distress, loss of solatium, loss of companionship, society, affection, consortium and guidance, including treble damages under 18 U.S.C. 2333, plus interest, costs, attorneys fees, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate plaintiff.

**COUNT SIX**
**(Greer C. Janis against all defendants)**
**18 U.S.C. § 2333**

226.    Plaintiff adopts and incorporates the allegations and facts contained in prior

paragraphs and in allegations common to all counts.

227.    Plaintiff Greer C. Janis is a U.S. national injured by reason of an act of international

terrorism and seeks damages under 18 U.S.C. § 2333.  Greer Janis' father Thomas Janis was

murdered by defendants.

228.    Plaintiff was victimized by acts of "international terrorism" as defined by 18 U.S.C. §

2331(1) which states:

> **"(1)** the term "international terrorism" means activities that--
>
>> **(A)** involve violent acts or acts dangerous to human life that are a
>> violation of the criminal laws of the United States or of any State, or
>> that would be a criminal violation if committed within the jurisdiction
>> of the United States or of any State;
>>
>> **(B)** appear to be intended--
>>> **(i)** to intimidate or coerce a civilian population;
>>> **(ii)** to influence the policy of a government by intimidation or
>>> coercion; or
>>> **(iii)** to affect the conduct of a government by mass destruction,
>>> assassination, or kidnapping; and
>>
>> **(C)** occur primarily outside the territorial jurisdiction of the United
>> States, or transcend national boundaries in terms of the means by
>> which they are accomplished, the persons they appear intended to
>> intimidate or coerce, or the locale in which their perpetrators operate
>> or seek asylum."

229.    On February 13, 2003, members of the FARC opened fire on a U.S. registered aircraft

as it was flying over southern Colombia on a counter-narcotics surveillance mission.   The

plane was crewed by four U.S. nationals employed by California Microwave Systems (a

subsidiary of Northrop Grumman), and one Colombian soldier.  Plaintiff Thomas Janis was

pilot and aircraft commander on board the aircraft on February 13, 2003.

230.    All five occupants of the plane survived a crash-landing, but were immediately taken

captive by FARC terrorists who quickly located and continued to fire automatic weapons on

the aircraft and crew of the downed plane.  The U.S national pilot, Thomas Janis, was

captured and then shot and killed by FARC members shortly after the crash landing, and his

body left a short distance from the damaged plane.

231.    Defendant, REVOLUTIONARY ARMED FORCES OF COLOMBIA ("FARC"), or

in Spanish FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, is a designated

foreign terrorist organization pursuant to Title 8, United States Code, Section 1189 originally

designated on October 8, 1997 and re-designated on September 5, 2001 and committed these

acts directly against the plaintiff Greer Janis, by killing her father Thomas Janis.

232.    Individual defendants committed these acts directly against plaintiff Greer Janis

injuring her by killing her father Thomas Janis or conspired to commit acts to provide

logistics, financing, safe houses and safe havens, transportation, communications, funds,

transfer of funds, other in kind material benefit, false documentation or identification

including alias names, weapons, explosives, non-medical training, ammunition, and

chemicals required to produce cocaine to further terrorist activity of the terrorist organization

FARC.

233.    Defendants murdered Thomas Janis and/or knowingly aided and abetted or conspired to

provide material support to the perpetrators of such acts.  Defendants also aided, abetted,

conspired, or otherwise engaged in or provided material support for the acts of international

58

terrorism, including but not limited to providing material support and/or aiding and abetting assistance to the FARC. This material support and/or aiding and abetting of acts of international terrorism allowed defendants to carry out the kidnapping, torture, and wrongful death of plaintiffs and specifically Thomas Janis.

234. Defendants specifically targeted U.S nationals as terrorist targets, shot down a U.S. registered aircraft performing a counter-narcotics mission, then murdered its pilot Tom Janis, murdered the Colombian soldier Luis Alcides Cruz and kidnapped and held hostage plaintiffs Keith Stansell, Marc Gonsalves and Tom Howes. Non-voluntary proof of life videotapes were created, communicated, and published in the United States for demands for demilitarized zones and prisoner exchanges. Defendants claimed responsibility for the murders and hostage taking.

235. Defendants' activities involved violent and dangerous acts to human life that were, and are, a violation of the criminal laws of the United States or of any State.

236. Defendants' acts were intended to intimidate or coerce the Colombian and United States civilian population, to influence policy of the U.S Government by intimidation or coercion, and to affect the conduct of a government by kidnapping, hostage taking and assassination.

237. Defendants' activities occurred outside the territorial jurisdiction of the United States and transcend international boundaries.

238. Defendants' acts are therefore acts of international terrorism as defined under 18 U.S.C. §2331 and §2333.

239.     Defendants' acts and their participation in the terrorist conspiracy are "terrorism" and "terrorist activity" under 18 U.S.C. §2339.

240.     Defendants intentionally and purposefully hid and concealed their true identities, physical whereabouts and their involvement in the FARC terrorist activities, including hostage taking, kidnapping, killing and imprisoning Plaintiffs.

241.     As a terrorist organization, or as members of a terrorist organization and criminal conspiracy, defendants are all terrorist parties who proximately caused the death and injuries described herein and are all jointly and severally liable for the terrorist acts, including acts of international terrorism, the aiding and abetting of international terrorism, conspiring to commit further acts of international terror, engaging in a joint single enterprise to conduct international terrorism through illegal schemes, and/or the material support and sponsorship of international terrorism.

**WHEREFORE**, Plaintiff, Greer Janis, demands judgment against all defendants, jointly and severally, for her past and future mental pain and suffering, anguish, emotional distress, loss of solatium, loss of companionship, society, affection, consortium and guidance, including treble damages under 18 U.S.C. 2333, plus interest, costs, attorneys fees, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate plaintiff.

## COUNT SEVEN
### (Michael I. Janis against all defendants)
### 18 U.S.C. § 2333

242.     Plaintiff adopts and incorporates the allegations and facts contained in prior paragraphs and in allegations common to all counts.

243.     Plaintiff Michael I. Janis is a U.S. national injured by reason of an act of international

terrorism and seeks damages under 18 U.S.C. § 2333.  Michael Janis' father Thomas Janis

was murdered by defendants.

244.     Plaintiff was victimized by acts of "international terrorism" as defined by 18 U.S.C. §

2331(1) which states:

>    **"(1)** the term "international terrorism" means activities that--
>
>>    **(A)** involve violent acts or acts dangerous to human life that are a
>>    violation of the criminal laws of the United States or of any State, or
>>    that would be a criminal violation if committed within the jurisdiction
>>    of the United States or of any State;
>>
>>    **(B)** appear to be intended--
>>>    **(i)** to intimidate or coerce a civilian population;
>>>    **(ii)** to influence the policy of a government by intimidation or
>>>    coercion; or
>>>    **(iii)** to affect the conduct of a government by mass destruction,
>>>    assassination, or kidnapping; and
>>
>>    **(C)** occur primarily outside the territorial jurisdiction of the United
>>    States, or transcend national boundaries in terms of the means by
>>    which they are accomplished, the persons they appear intended to
>>    intimidate or coerce, or the locale in which their perpetrators operate
>>    or seek asylum."

245.     On February 13, 2003, members of the FARC opened fire on a U.S. registered aircraft

as it was flying over southern Colombia on a counter-narcotics surveillance mission.   The

plane was crewed by four U.S. nationals employed by California Microwave Systems (a

subsidiary of Northrop Grumman), and one Colombian soldier.  Plaintiff Thomas Janis was

pilot and aircraft commander on board the aircraft on February 13, 2003.

246.     All five occupants of the plane survived a crash-landing, but were immediately taken

captive by FARC terrorists who quickly located and continued to fire automatic weapons on

the aircraft and crew of the downed plane.  The U.S national pilot, Thomas Janis, was

captured and then shot and killed by FARC members shortly after the crash landing, and his

body left a short distance from the damaged plane.

247.   Defendant, REVOLUTIONARY ARMED FORCES OF COLOMBIA ("FARC"), or

in Spanish FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, is a designated

foreign terrorist organization pursuant to Title 8, United States Code, Section 1189 originally

designated on October 8, 1997 and re-designated on September 5, 2001 and committed these

acts directly against the plaintiff Michael Janis by killing his father Thomas Janis.

248.   Individual defendants committed these acts directly against plaintiff Michael Janis

injuring him by killing his father Thomas Janis or conspired to commit acts to provide

logistics, financing, safe houses and safe havens, transportation, communications, funds,

transfer of funds, other in kind material benefit, false documentation or identification

including alias names, weapons, explosives, non-medical training, ammunition, and

chemicals required to produce cocaine to further terrorist activity of the terrorist organization

FARC.

249.   Defendants murdered Thomas Janis and/or knowingly aided and abetted or conspired to

provide material support to the perpetrators of such acts.  Defendants also aided, abetted,

conspired, or otherwise engaged in or provided material support for the acts of international

terrorism, including but not limited to providing material support and/or aiding and abetting

assistance to the FARC.  This material support and/or aiding and abetting of acts of international

terrorism allowed defendants to carry out the kidnapping, torture, and wrongful death of

plaintiffs and specifically Thomas Janis.

250.    Defendants specifically targeted U.S nationals as terrorist targets, shot down a U.S. registered aircraft performing a counter-narcotics mission, then murdered its pilot Tom Janis, murdered the Colombian soldier Luis Alcides Cruz and kidnapped and held hostage plaintiffs Keith Stansell, Marc Gonsalves and Tom Howes.  Non-voluntary proof of life videotapes were created, communicated, and published in the United States for demands for demilitarized zones and prisoner exchanges.  Defendants claimed responsibility for the murders and hostage taking.

251.    Defendants' activities involved violent and dangerous acts to human life that were, and are, a violation of the criminal laws of the United States or of any State.

252.    Defendants' acts were intended to intimidate or coerce the Colombian and United States civilian population, to influence policy of the U.S Government by intimidation or coercion, and to affect the conduct of a government by kidnapping, hostage taking and assassination.

253.    Defendants' activities occurred outside the territorial jurisdiction of the United States and transcend international boundaries.

254.    Defendants' acts are therefore acts of international terrorism as defined under 18 U.S.C. §2331 and §2333.

255.    Defendants' acts and their participation in the terrorist conspiracy are "terrorism" and "terrorist activity" under 18 U.S.C. §2339.

256.    Defendants intentionally and purposefully hid and concealed their true identities, physical whereabouts and their involvement in the FARC terrorist activities, including hostage taking, kidnapping, killing and imprisoning Plaintiffs.

257.     As a terrorist organization, or as members of a terrorist organization and criminal conspiracy, defendants are all terrorist parties who proximately caused the death and injuries described herein and are all jointly and severally liable for the terrorist acts, including acts of international terrorism, the aiding and abetting of international terrorism, conspiring to commit further acts of international terror, engaging in a joint single enterprise to conduct international terrorism through illegal schemes, and/or the material support and sponsorship of international terrorism.

**WHEREFORE**, Plaintiff, Michael Janis, demands judgment against all defendants, jointly and severally, for his past and future mental pain and suffering, anguish, emotional distress, loss of solatium, loss of companionship, society, affection, consortium and guidance, including treble damages under 18 U.S.C. 2333, plus interest, costs, attorneys fees, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate plaintiff.

### COUNT EIGHT
**(Jonathan N. Janis against all defendants)**
**18 U.S.C. § 2333**

258.     Plaintiff adopts and incorporates the allegations and facts contained in prior paragraphs and in allegations common to all counts.

259.     Plaintiff Jonathan N. Janis is a U.S. national injured by reason of an act of international terrorism and seeks damages under 18 U.S.C. § 2333.  Jonathan Janis' father Thomas Janis was murdered by defendants.

260.     Plaintiff was victimized by acts of "international terrorism" as defined by 18 U.S.C. § 2331(1) which states:

**"(1)** the term "international terrorism" means activities that--

> **(A)** involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

> **(B)** appear to be intended--
> > **(i)** to intimidate or coerce a civilian population;
> > **(ii)** to influence the policy of a government by intimidation or coercion; or
> > **(iii)** to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

> **(C)** occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

261.    On February 13, 2003, members of the FARC opened fire on a U.S. registered aircraft as it was flying over southern Colombia on a counter-narcotics surveillance mission.   The plane was crewed by four U.S. nationals employed by California Microwave Systems (a subsidiary of Northrop Grumman), and one Colombian soldier.  Plaintiff Thomas Janis was pilot and aircraft commander on board the aircraft on February 13, 2003.

262.    All five occupants of the plane survived a crash-landing, but were immediately taken captive by FARC terrorists who quickly located and continued to fire automatic weapons on the aircraft and crew of the downed plane.  The U.S national pilot, Thomas Janis, was captured and then shot and killed by FARC members shortly after the crash landing, and his body left a short distance from the damaged plane.

263.    Defendant, REVOLUTIONARY ARMED FORCES OF COLOMBIA ("FARC"), or in Spanish FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, is a designated

foreign terrorist organization pursuant to Title 8, United States Code, Section 1189 originally

designated on October 8, 1997 and re-designated on September 5, 2001 and committed these

acts directly against the plaintiff Jonathan Janis by killing his father Thomas Janis.

264.	Individual defendants committed these acts directly against plaintiff Jonathan Janis

injuring him by killing his father Thomas Janis or conspired to commit acts to provide

logistics, financing, safe houses and safe havens, transportation, communications, funds,

transfer of funds, other in kind material benefit, false documentation or identification

including alias names, weapons, explosives, non-medical training, ammunition, and

chemicals required to produce cocaine to further terrorist activity of the terrorist organization

FARC.

265.	Defendants murdered Thomas Janis and/or knowingly aided and abetted or conspired to

provide material support to the perpetrators of such acts.  Defendants also aided, abetted,

conspired, or otherwise engaged in or provided material support for the acts of international

terrorism, including but not limited to providing material support and/or aiding and abetting

assistance to the FARC.  This material support and/or aiding and abetting of acts of international

terrorism allowed defendants to carry out the kidnapping, torture, and wrongful death of

plaintiffs and specifically Thomas Janis.

266.	Defendants specifically targeted U.S nationals as terrorist targets, shot down a U.S.

registered aircraft performing a counter-narcotics mission, then murdered its pilot Tom Janis,

murdered the Colombian soldier Luis Alcides Cruz and kidnapped and held hostage plaintiffs

Keith Stansell, Marc Gonsalves and Tom Howes.  Non-voluntary proof of life videotapes

were created, communicated, and published in the United States for demands for

demilitarized zones and prisoner exchanges.  Defendants claimed responsibility for the murders and hostage taking.

267.     Defendants' activities involved violent and dangerous acts to human life that were, and are, a violation of the criminal laws of the United States or of any State.

268.     Defendants' acts were intended to intimidate or coerce the Colombian and United States civilian population, to influence policy of the U.S. Government by intimidation or coercion, and to affect the conduct of a government by kidnapping, hostage taking and assassination.

269.     Defendants' activities occurred outside the territorial jurisdiction of the United States and transcend international boundaries.

270.     Defendants' acts are therefore acts of international terrorism as defined under 18 U.S.C. §2331 and §2333.

271.     Defendants' acts and their participation in the terrorist conspiracy are "terrorism" and "terrorist activity" under 18 U.S.C. §2339.

272.     Defendants intentionally and purposefully hid and concealed their true identities, physical whereabouts and their involvement in the FARC terrorist activities, including hostage taking, kidnapping, killing and imprisoning Plaintiffs.

273.     As a terrorist organization, or as members of a terrorist organization and criminal conspiracy, defendants are all terrorist parties who proximately caused the death and injuries described herein and are all jointly and severally liable for the terrorist acts, including acts of international terrorism, the aiding and abetting of international terrorism, conspiring to commit further acts of international terror, engaging in a joint single enterprise to conduct

international terrorism through illegal schemes, and/or the material support and sponsorship of international terrorism.

**WHEREFORE**, Plaintiff, Jonathan Janis, demands judgment against all defendants, jointly and severally, for his past and future mental pain and suffering, anguish, emotional distress, loss of solatium, loss of companionship, society, affection, consortium and guidance, including treble damages under 18 U.S.C. 2333, plus interest, costs, attorneys fees, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate plaintiff.

DATED: _NOVEMBER 10, 2009_

NEWTON P. PORTER
Trial Counsel
(Florida Bar No. 833738)
nporter@porterandkorvick.com
PORTER & KORVICK, P.A.
Pinecrest Professional Building
9655 South Dixie Highway Suite 208
Miami, Florida 33156
Telephone:    (305) 373-5040
Facsimile:    (305) 668-9154
Attorneys for Plaintiffs

TONY KORVICK
Trial Counsel
(Florida Bar No. 768405)
tkorvick@porterandkorvick.com
PORTER & KORVICK, P.A.
Pinecrest Professional Building
9655 South Dixie Highway Suite 208
Miami, Florida 33156
Telephone:    (305) 373-5040
Facsimile:    (305) 668-9154
Attorneys for Plaintiffs