UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KEITH STANSELL, MARC GONSALVES,
THOMAS HOWES, JUDITH G. JANIS,
CHRISTOPHER T. JANIS, GREER C. JANIS,
MICHAEL I. JANIS, AND JONATHAN N. JANIS,

       Plaintiffs,

v.                           Case No.: 8:09-CV-02308-RAL-MAP

REVOLUTIONARY ARMED FORCES OF
COLOMBIA (FARC), et al.,

       Defendants.

_____/

## EXPERT REPORT OF DR. IBRAHIM A. WARDE

1.   My name is Dr. Ibrahim A. Warde, and I was born in Lebanon in 1953.  I am a citizen of

    the United States, where I have resided since 1979.  As described in greater detail, below,

    I have a doctorate degree in political science and was educated in the United States,

    France, and Lebanon.  I am currently an Adjunct Professor of International Business at

    the Fletcher School of Law and Diplomacy at Tufts University in Medford,

    Massachusetts.  Between 2007 and 2009, I was also a Carnegie scholar working on

    informal and underground finance in the Islamic world.

2.   I have published numerous books and articles on terrorism, finance in the Islamic world,

    Middle Eastern politics, and related issues.  I have written various books, including *The

    Price of Fear: The Truth Behind the Financial War on Terror* (2007), which has been

    translated into French, Italian, Japanese, and Czech, and which was selected by *Foreign

    Affairs* as one of the best books of the year regarding economic, social, and

1

environmental issues.  *The Price of Fear* examined specifically the mythologies, fictions and false claims made about terrorism and its financing.  I also researched the growing industry of terrorism "experts", who often lacked the requisite cultural and linguistic training and who have been too quick to allege various unsubstantiated "links" between largely unconnected organizations.  Incidentally, my book analyzed the reporting of Mr. Douglas Farah, who has also served as an expert witness in this litigation (as discussed below).  I noted in my book (*see Price of Fear* at 71) that Mr. Farah had admitted in his own book (*see* Mr. Farah's book, *Blood for Stones:  The Secret Financial Network of Terror*, at 9-10) that he had scant knowledge of either terrorism or the Islamic world, so I was surprised to see his name appear in this case as an expert in connection with Hezbollah.

3.   My other books include *Islamic Finance in the Global Economy* (2000), now in its second edition (2010).  I am also a writer for *Le Monde Diplomatique*, where my articles have been translated in 29 languages.

4.   I have previously taught at the University of California, Berkeley, at MIT's Sloan School of Management, and at other universities in the United States and abroad.  I have lectured on topics related to Islam, illicit finance, and terrorism.

5.   In my academic work, I have research, studied, analyzed and written about Hezbollah, terrorist financing, and related issues.  Some of my research and study has been undertaken in Lebanon, where I have interviewed members of Hezbollah and learned an extensive amount about the organization and its financing.  As a result of this work, I frequently cover Hezbollah and issues relating to Hezbollah in my teaching.  Most recently, in every one of the courses I have taught this year at the Fletcher School, I have

covered Hezbollah.  For example, in my course "The Arabs and Their Neighbors" (which I co-taught), I focused key lectures on Lebanese and Iranian politics, including the role and conduct of Hezbollah.  In my course on "Islam and Politics", I devoted a substantial amount of time to Hezbollah, the evolution of its religious beliefs, its ideology, and its international alliances.  In my course on "Islamic Banking and Finance", I covered Hezbollah's finances, almsgiving, charities, religious endowments and other aspects directly relevant to the Shi'a (especially the "khoms").  And in my course on "Informal and Underground Finance", I spent a great deal of time discussing the drug trade and other criminal activities in Latin America.  After many years of experience researching, studying, and analyzing terrorist organizations and terrorist financing in the Islamic world – including Hezbollah in particular – I am qualified to speak with some authority on the factual issues raised in this particular litigation.

6. I hold an M.A. and a PhD in Political Science from the University of California, Berkeley, an M.B.A. from France's Ecole des Hautes Etudes Commerciales, and a B.A. from Université Saint Joseph in Beirut, Lebanon.

7. During the previous four years, I have not testified as an expert witness at any trial or by deposition.

8. I am being paid a flat fee of $28,000 for my time and effort spent researching, reviewing, and analyzing the relevant materials, and for my time and effort spent preparing this expert report.  I was not paid to have a particular view; this report reflects my independent research, review, analysis, judgment, and opinions.  If there is an evidentiary hearing, I will be paid $5,000 per day, plus expenses, for time and effort spent preparing for and testifying at trial.

3

## I.    <u>Materials Reviewed</u>

9.   I have reviewed the following materials in preparing this report:

- Affidavit of Mr. Douglas C. Farah (Jan. 1, 2015).  **Exhibit 1** and **Exhibit 2**.

- *United States v. Lebanese Canadian Bank*, No. 11-cv-9186 (S.D.N.Y. Oct. 26, 2012) (verified amended complaint). **Exhibit 3**.

- U.S. House Committee on Homeland Security, Subcommittee on Oversight, Investigations, and Management, Majority Report, *A Line in the Sand:  Countering Crime, Violence and Terror at the Southwest Border* (Nov. 2012). **Exhibit 4**.

- Designations of Terrorists and Terrorist Organizations Pursuant to Executive Order 13224 of September 23, 2001, 67 Fed. Reg. 12633 (Mar 19, 2002).  **Exhibit 5**.

- Court Order (setting forth the standard for "agency or instrumentality"). Dkt. 900.

- Affidavit of Christopher J. Porter.  Dkt. 311.

- Affidavit of Luis Miguel Cote Gonzalez. Dkt. 312.

- U.S. Department of the Treasury, Press Release, *Treasury Targets Hizballah Financial Network* (Dec. 9, 2010).  **Exhibit 6**.

- *United States v. Marin et al.*, No. 04-cr-00446 (D.D.C. Mar. 1, 2006) (criminal indictment). **Exhibit 7**.

- Exec. Order No. 12947 (Jan. 25, 1995).  **Exhibit 8**.

- Exec. Order No. 13224 (Sept.  23, 2001).  **Exhibit 9**.

- Exec. Order No. 13581 (July 24, 2011).  **Exhibit 10**.

- U.S. Department of the Treasury, Press Release, *Treasury Targets Hizballah Network in Africa* (May 27, 2009).  **Exhibit 11**.

- *Stansell v. FARC*, 704 F.3d 910 (11th Cir. 2013). **Exhibit 12**.

- Claimants Kassim Tajideen, Grupo Arosfran Empreendimentos E Participacoes SARL, and Ovlas Trading, S.A.'s Motion to Dissolve Writs of Garnishment and Memorandum of Law (Apr. 16, 2015). Dkt. 961.

- Plaintiffs' Appendix in Support of Post-Judgment Execution Against Agencies and Instrumentalities of the FARC (Aug. 31, 2011). Dkt. 313.

- *Stansell v. FARC*, 771 F.3d 713 (11th Cir. 2014). **Exhibit 13**.

- Plaintiffs' Complaint (Nov.12, 2009). Dkt. 1.

- Testimony of Douglas Farah, House Financial Services Subcommittee on Monetary Policy and Trade, *A Legislative Proposal Entitled the 'Bank Account Seizure of Terrorist Assets (BASTA) Act* (July 17, 2014). **Exhibit 14**.

- Ibrahim Warde, *The Price of Fear: The Truth Behind the Financial War on Terror* (2007).

- Various academic and policy studies dealing with Hezbollah, Iran, FARC, as well as drug trafficking, financial crime and politics in various Latin American countries

II. **Summary**

10. I have been asked to provide my expert report, analysis, judgment, and opinion regarding an alleged relationship between Hezbollah and the Revolutionary Armed Forced of Colombia (FARC). In particular, I have been asked to assess the expert opinion of Douglas C. Farah, **Exhibit 1**, and to opine on whether, under the court's definitions and standards, Dkt. 900, Hezbollah can fairly be characterized as an "agency or instrumentality" of the FARC.

11. In arriving at the independent judgments and opinions expressed in this testimony, I have reviewed the relevant court filings in this case, relevant published material, including

5

documents from other litigations, relating to Hezbollah, the FARC, international terrorism, narcotics trafficking, and other topics. I have also drawn upon my decades of scholarly research on illicit finance globally and specifically in the Islamic world and spoken with other experts on these topics. The technique I have used in writing this expert opinion is to apply my expertise in these academic fields to the question at hand and to assess the accuracy of the expert opinion submitted by the Plaintiffs' own expert in this case, Mr. Douglas C. Farah. Applying a body of regional and financial expertise to a question like this is widely accepted in scholarly inquiry and writing generally and in the fields of international relations and finance specifically. The knowledge and expertise upon which I based these opinions have been subjected to decades of peer and editor review of my articles, books, other publications, and lectures in the United States, Europe, and around the world. The methodology I have employed in this report is based upon widely-accepted standards in my fields of expertise and the broader academic, scholarly, and scientific community.

12. Based on my expert opinion and review of the relevant materials in this case, I describe below why I believe that Hezbollah, which has engaged in numerous reprehensible acts of terrorism around the world, cannot possibly be considered to be an "agency or instrumentality" of the FARC. To the contrary, Hezbollah does not take direction from, or act at the behest of, or on behalf of, the FARC but rather, at most, has indirect and tangential relations with the FARC, for example through loosely affiliated individuals or organizations that may engage in commercial, arms-length transactions with the FARC. Hezbollah has built itself up to operate with relative autonomy today, but if Hezbollah can be considered to be a true agency or instrumentality of any other entity, it would be

6

an agency or instrumentality of the Islamic Republic of Iran, not of a comparatively minor, geographically distant, culturally dissimilar, and politically unrelated organization, such as the FARC.

### III.   Mr. Farah's Affidavit Is Fundamentally Flawed, Inaccurate, and Misleading

13. The Plaintiffs rely on an affidavit from an expert named Douglas C. Farah.  **Exhibit 1**.  I was generally familiar with Mr. Farah's work long before I was engaged as an expert in this case, as I thoroughly examined some of his reporting for my 2007 book, *The Price of Fear*.  In my expert opinion and based upon my review of all relevant materials in this case, Mr. Farah's affidavit is fundamentally flawed, inaccurate, and misleading regarding the alleged relationship between Hezbollah and the FARC; in particular, my expert opinion is that Mr. Farah's report alters and misrepresents the content of primary source material, fails to include citations to work that he has copied and then altered, relies heavily on unsubstantiated and conclusory assertions in the absence of reliable evidence or support, and embellishes press reports based on unsupported speculation and assumptions.  In my expert opinion, such methodology is inconsistent with an objective, expert assessment of the facts and evidence.  For these reasons, I am not persuaded by Mr. Farah's conclusions and believe they cannot reasonably form the basis of any factual or legal findings.

14. To begin, Mr. Farah has apparently cut and pasted a large portion of his report from other sources, generally without adequate citation.  Mr. Farah has also materially altered the language of the materials he has copied, such that the meaning is no longer consistent with and supported by the original source.  Based on my review, it appears that Mr. Farah has employed this method throughout his report.  In some cases, Mr. Farah has even

altered the language and meaning of his own prior testimony in other contexts.  In my expert opinion, this method of copying, pasting, omitting citations, and then altering language and meaning is inconsistent with the work of a credible, objective, and independent expert.

15. Merely to illustrate the point, I have focused on several examples that are most relevant to the relationship that is alleged by Mr. Farah to exist between Hezbollah and the FARC.

16. At paragraph 28 of his affidavit, for example, Mr. Farah copies a paragraph – nearly verbatim – from testimony that he himself provided to the House Financial Services Subcommittee on Monetary Policy and Trade on July 17, 2014.  *Compare* **Exhibit 1,** para. 28 *with* **Exhibit 14,** page 7.  I say "nearly verbatim" because Mr. Farah made changes to the language in his prior testimony in a manner that renders the new testimony inaccurate and misleading.  Specifically, Mr. Farah changed his prior testimony about an alleged relationship between *Iran* and the FARC to make it seem as if the alleged relationship is really between Hezbollah and the FARC.  The result is that Mr. Farah's affidavit is both inconsistent with his prior testimony before the House and, more importantly, factually inaccurate and misleading in the present case.  The following chart illustrates Mr. Farah's alteration and the resulting inaccuracy:

| Mr. Farah's testimony before Congress at page 7 (**Exhibit 14**) | Mr. Farah's affidavit at para. 28 (**Exhibit 1**) |
|---|---|
| The [meat-processing] plant was never built but it provided the FARC leadership with several months of unmonitored time with the Iranian officials, a relationship that endures to the present time. | The [meat-processing] plant was never built but it provided the FARC leadership with several months of unmonitored time with the Iranian officials, *and most importantly Iran's terrorist and money laundering arm Hezbollah.*  This relationship between the FARC *and Hezbollah* endures to the present time. |

It bears further mention that this same testimony is misleading in yet another way.  In Mr. Farah's testimony before the House Subcommittee, Mr. Farah said that his source for this

information was a news article by Karl Penhaul, titled "Iranians in Sideshow to Colombia peace process." **Exhibit 14**, footnote 16.  That article reported on a trip to Colombia by "Iranian businessmen"; although an individual interviewed by the reporter suggested that these "businessmen" might have been "Iranian government officials," the reporter never substantiated that claim and never reported it as fact.  Yet, Mr. Farah relies on the article and now testifies in the present case that the individuals who visited Colombia were "Iranian government officials, and most importantly Iran's terrorist and money laundering arm Hezbollah." **Exhibit 1**, para. 28.  This is inconsistent with his own prior testimony and the underlying article.  To summarize, Mr. Farah started with an article about an alleged trip by Iranian businessmen to Colombia, testified before Congress that the article demonstrated a link between *Iranian government officials* and the FARC, and then changed his testimony to suggest that the link was actually between Hezbollah and the FARC.  In my expert opinion, this reflects questionable methodology for an expert, and the evidence simply does not support Mr. Farah's conclusion.

17. In another series of examples, Mr. Farah purports to describe Hezbollah's alleged relationship with the FARC. **Exhibit 1**, paras. 43-59.  The vast majority of this material is copied – nearly verbatim – from an amended complaint filed by the U.S. Attorney for the Southern District of New York in *United States v. Lebanese Canadian Bank et al.*, 11 Civ. 9186 (S.D.N.Y.) (the "LCB complaint"). **Exhibit 3**.  Again, I say "nearly verbatim" because Mr. Farah has again altered the text in a manner that is inaccurate and misleading.

18. In one example, Mr. Farah copies a series of paragraphs from the LCB Complaint describing basic facts about Hezbollah, but then omits a key paragraph that is inconsistent

9

with his position in this case.  Specifically, Mr. Farah's paragraphs 43, 44, and 45 are verbatim copies of LCB Complaint paragraphs 36, 37, and 39, but not paragraph 38. *Compare* **Exhibit 1** *with* **Exhibit 3**.  Notably, paragraph 38 of the LCB Complaint states, among other things, that "Hizballah operates … *within Lebanon* … and has been described as a '*state within a state*.'"  *See* **Exhibit 3**, para. 38.  The fact that Hezbollah operates in Lebanon as a state-like entity (and is a proxy for Iran) is inconsistent with Mr. Farah's theory that Hezbollah is a proxy for the FARC.  His omission of the paragraph is telling.

19. In another example, Mr. Farah has altered three key paragraphs from the LCB Complaint, in an apparent effort to create a connection between the FARC and Hezbollah, notwithstanding that the LCB Complaint does not make any such connection.

    a.  For example, where the LCB Complaint refers to "[n]arco-traffickers connected to the money laundering scheme," Mr. Farah alters it to refer instead to "*Hezbollah and its members, including the money laundering fronts and schemes.*"  *Compare* **Exhibit 3**, para. 43 *with* **Exhibit 1**, para. 50.

    b.  In another example, where the LCB Complaint refers to Ayman Joumaa's "drug-trafficking organization," Mr. Farah alters it to refer instead to Ayman Joumaa's "*Hezbollah's money laundering and drug trafficking network.*"  *Compare* **Exhibit 3**, para. 43.a. *with* **Exhibit 1**, para. 51.

    c.  In another example, where the LCB Complaint refers to "Joumaa's organization," Mr. Farah alters it to refer instead to "*Hezbollah's illegal transit network.*" *Compare* **Exhibit 3**, para. 43.a. *with* **Exhibit 1**, para. 51.

d.  In yet another example, where the LCB Complaint says that "Joumaa's organization pays fees to Hizballah to facilitate the transportation and laundering of narcotics proceeds," Mr. Farah alters it to say that "*Hezbollah is paid a fee to facilitate the transportation and laundering of FARC narcotics proceeds.*"

Compare **Exhibit 3**, para. 43.a. *with* **Exhibit 1,** para. 51.

The following chart illustrates Mr. Farah's alterations and resulting inaccuracies:

| The LCB Complaint (**Exhibit 3**) | Mr. Farah's affidavit at paragraphs 50-51 (**Exhibit 1**) |
| --- | --- |
| 42.  According to a 2010 report by the U.S. Congressional Research Service, law enforcement officials seized at least 46 metric tons of cocaine bound for Europe via West Africa between 2005 and 2008. As much as 300 metric tons of cocaine, worth approximately $13.5 billion, is estimated to be trafficked through West Africa to Europe each year. The wholesale profits reaped by narco-traffickers during this period are estimated to be approximately $3.5 billion per year. | 49.  According to a 2010 report by the U.S. Congressional Research Service, law enforcement officials seized at least 46 metric tons of cocaine bound for Europe via West Africa between 2005 and 2008. As much as 300 metric tons of cocaine, worth approximately $13.5 billion, is estimated to be trafficked through West Africa to Europe each year. The wholesale profits reaped by narco-traffickers during this period are estimated to be approximately $3.5 billion per year. |
| 43.  Narco-traffickers connected to the money laundering scheme are heavily involved in this West African narcotics trade for the FARC and its global cocaine distribution from Colombia.  For example: | 50.  *Hezbollah and its members, including the money laundering fronts and schemes,* are heavily involved in this West African narcotics trade for the FARC and its global cocaine distribution from Colombia. |
| a. Ayman Joumaa's drug-trafficking organization transports, distributes and sells multi-ton bulk shipments of South American cocaine through West Africa. Joumaa and his organization operate in Lebanon, West Africa, Panama and Colombia, and launder proceeds from their illicit activities, as much as $200 million per month, through various channels, including bulk cash smuggling operations and Lebanese exchange houses. Joumaa's organization uses, among other things, Hizballah couriers | 51. For example, Ayman Joumaa *is a member of Hezbollah's money laundering and drug trafficking network. This drug trafficking organization* transports, distributes and sells multi-ton bulk shipments of South American cocaine through West Africa. Joumaa and his organization operate in Lebanon, West Africa, Panama and Colombia, and launder proceeds from their illicit activities, as much as $200 million per month, through various channels, including bulk cash smuggling operations and Lebanese |

| | |
|---|---|
| to transport and launder narcotics proceeds.  Joumaa's organization pays fees to Hizballah to facilitate the transportation and laundering of narcotics proceeds. … | exchange houses. *Hezbollah's illegal transit network transports cocaine and launders narcotics proceeds. Hezbollah is paid a fee to facilitate the transportation and laundering of FARC narcotics proceeds….* |

In my expert opinion, Mr. Farah alterations to the allegations in the LCB Complaint are both inaccurate and misleading.

20. It also bears noting that the underlying assertions in the LCB Complaint – even before Mr. Farah altered them – are merely uncontested *allegations* at the outset of a litigation. Mr. Farah fails to treat them as such and instead copies and relies on them as if they are findings of fact.  In my expert opinion, sound expert analysis and opinion cannot rest solely on mere allegations in a litigation; nor can it rest on mere allegations that have been *altered after the fact* without any evidentiary basis or other support.  Rather, an expert must independently research and gather information and evidence, objectively analyze and test the information and evidence, and form one's own judgments and opinions based thereon.  Mr. Farah has instead copied and altered the mere allegations of others.

21. In yet another example, Mr. Farah purports to quote a "U.S. House of Representatives Majority Report" for the proposition that "the FARC is operating with Iran and Hezbollah in Venezuela."  **Exhibit 1**, para. 59.  In fact, however, the report that he cites says no such thing.  To the contrary, the report is essentially silent on the alleged relationship between Hezbollah and the FARC and focuses instead on an alleged relationship between "*Venezuela and the FARC*," which – according to the Report – "often work together in the trafficking of cocaine for mutual benefit."  *See* **Exhibit 4**,

12

page 12.  Although Mr. Farah would have the court believe that the language he quoted came from a "U.S. House of Representatives Majority Report," in fact he copied it from a miscellaneous set of "observations" by five individual members of the House in an advocacy letter to the Executive Branch (which is appended to the Report he claims to quote) in which the members make a policy "recommendation" that *Venezuela* be designated a state sponsor of terrorism.  *See* **Exhibit 4**, Appendix.  In my expert opinion, the "observations" of individual members of Congress in political advocacy letters cannot fairly be characterized as a finding in a "U.S. House of Representatives Majority Report." Nor can such political advocacy be characterized as objectively truthful when it is not supported by any authority, citations, or evidence.

22. It also bears noting that Mr. Farah has apparently formulated his ultimate opinion regarding the alleged relationship between Hezbollah and the FARC by copying verbatim the court's standard and asserting it as fact with regard to these two organizations.  *See* **Exhibit 1**, paras. 79-83.  Mr. Farah does not even attempt to provide supporting analysis and evidence or to otherwise explain the basis for asserting that the court's legal standard has been met.  Nor does he provide any support or otherwise explain the factual basis for his legal conclusions regarding the "members, affiliates, supporters, front companies, and financial networks" of Hezbollah or the FARC.  He merely repeats the court's standard and asserts the legal conclusion that that standard has been met.  In my expert opinion, Mr. Farah has failed to identify any reliable evidence, analysis, and support for his conclusions, which simply parrot the court's definitions and standards..

23. In light of these and a variety of other problems with Mr. Farah's report, it is my expert opinion that Mr. Farah has failed to make a credible case for the proposition – much less establish as fact – that Hezbollah is an "agency or instrumentality" of the FARC.

**IV.   In My Expert Opinion, Hezbollah Is Not An "Agency or Instrumentality" of the FARC**

24. My opinions are based on the education, experience, scholarship, teaching, materials reviewed, and methodology described above in the introductory paragraphs and in Sections I and II.

25. I have reviewed the various relevant court documents relevant to this issue, including the Order issued by the District Court Judge in this case that describes the standard for "agency or instrumentality." *E.g.*, Dkt. 900.  I have also reviewed the other materials set forth above, *supra* at Section I, "Materials Reviewed."

26. In my expert opinion, Hezbollah cannot be considered an "agency or instrumentality" of the FARC; to the contrary, such a relationship is inconsistent with any realistic understanding of how Hezbolah operates.   While demonstrating the *absence* of such a relationship poses obvious practical and conceptual challenges, I would note as an initial matter that Mr. Farah's failure to substantiate his claims that such a relationship *does* exist is itself powerful evidence that it *does not*.  In the interest of completion, however, I will nonetheless briefly outline the reasons why Hezbollah is not an "agency or instrumentality" of the FARC under the standard established by this Court.

27. For proper background, Hezbollah is a Shi'a Islamist militant group based in Lebanon and funded primarily by Iran.  In many ways, Hezbollah operates as a proxy for Iran, in part because the organizations are closely aligned ideologically and politically; they also share common enemies and common goals.  Hezbollah has a mix of Islamist and

nationalist ideology, based respectively on the doctrine of *Velayat el-Faqih* (rule of the jurisprudent) and compromises struck within the Lebanese political system.

28. There are a number of small Shi'a communities in Latin American countries.  Two of them have attracted some attention.  One lives in the Tri-Border Area (TBA) – a relatively lawless region along the frontiers of Argentina, Brazil, and Paraguay, known to be a haven for many illicit activities.  Hezbollah has been said to be present in one of the world's largest black markets in the TBA commercial district of Ciudad del Este, and to have taken advantage of the loosely regulated environment to solicit donations from Shi'a communities throughout the region.

29. The other controversial Shi'a community is in Buenos Aires in Argentina, where Iran has been suspected of being behind a major 1994 terrorist attack against a Jewish community center.  Though some operational and other details surrounding that attack remain a mystery, some have suggested that Hezbollah operatives were involved in the attack.

30. In addition, various international authorities have said that Hezbollah has been directly and indirectly involved in drug trafficking in Latin America. While there may be contacts and opportunistic connections between Hezbollah and the FARC, these loose connections fall far short of establishing any sort of alliance between the two groups. To claim that the two work closely together or are very close, requires multiple conflations of threats and the establishment of dubious links—between the war on drugs and the war on terror, among various Middle Eastern players (Iran, Syria and Hezbollah) and various Latin American players (in Argentina, the TBA, Cuba, Venezuela and Mexico) and between the Middle East and Latin America.

31. Anyone who understands the religious, political, and ideological beliefs of Hezbollah would find it impossible to imagine an alliance or close affiliation with FARC, let alone an agency or instrumentality relationship with the FARC. I believe that finding such a relationship requires massaging and manipulating the data in an inaccurate and misleading manner that cannot withstand serious scholarly scrutiny.

32. Hezbollah and the FARC have almost nothing in common, except for their willingness to engage in terrorism and other illicit activities.  The two organizations come from completely different cultures, have completely different ideologies and religious traditions, have different political agendas and goals, speak different languages, serve different constituencies, and operate in completely different parts of the world.  Against this backdrop, it is simply not credible to suggest – as Mr. Farah has – that even though Hezbollah is an "arm" of Iran, it is also an arm of the FARC.  I know of no evidence to support that theory.  Nor does it matter that individuals or entities loosely affiliated with Hezbollah are alleged to have trafficked in cocaine from South America; there is no proof the source of the cocaine was the FARC or that the individuals or entities acted on behalf, at the direction, or under the control of Hezbollah.  There is simply conjecture and speculation regarding these alleged affiliations.

33. As explained further below—and contrary to what is alleged—Hezbollah is not an "agency or instrumentality" of the FARC.  Neither is Hezbollah one of the FARC's "individual members, divisions or networks."  Moreover, it is not in my view "materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of," the international narcotics trafficking activities of the FARC. And Hezbollah is not "owned, controlled, or directed by, or acting for or on behalf of, the

FARC" or playing a "significant role" in international narcotics trafficking related to the FARC.

### A.  Hizballah is not one of the FARC's "individual members, divisions [or] networks."

34. I know of no evidence that Hezbollah serves as a "member" or "division" or "network" of the FARC.  Indeed, given Hezbollah's status as a state-like entity – with a significant political, military, and governance role in Lebanon, it is simply not credible to assert that Hezbollah is somehow a subordinate part of the FARC in the form of a member, division, or network.  As I discussed, the two organizations come from completely different cultures, have completely different ideologies and religious traditions, have different political agendas and goals, speak different languages, serve different constituencies, and operate in completely different parts of the world.  Indeed, they have almost nothing in common.  Mr. Farah would have the court believe that Hezbollah distributes cocaine for the FARC, but he offers no evidence to support that far-fetched theory.  To the extent that individuals or entities loosely affiliated with Hezbollah have operated in the TBA – and perhaps even purchased cocaine there – the TBA is not in or near FARC's operations in Colombia; moreover, the purchase of unspecified cocaine by unspecified individuals or entities loosely affiliated with Hezbollah obviously is not enough to establish any relationship between Hezbollah  and the FARC, much less enough to make Hezbollah an "agency" or "instrumentality" that answers to the FARC.

35. Mr. Farah's unsubstantiated allegations notwithstanding, I have seen no evidence that members of one organization have any significant interaction with members of the other organization, much less that the organizations themselves are interacting or that one is

subordinate to the other.  Likewise, I know of no evidence that one is a member, division, or network of the other.

**B.  *Hezbollah is not "materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of [the FARC]."***

36. In all the materials I reviewed in the preparation of this report – and in all the materials I have studied and analyzed for many years as an academic – I have never seen concrete, credible evidence that Hezbollah is providing material support and assistance to the FARC.  Thus, in my expert opinion, I do not believe that it is credible that Hezbollah is materially assisting in or providing financial or technological support for or providing goods or services in support of the activities of the FARC.

37. As I have seen in decades of academic study, it has become all too common for people to mistake mere allegations for proven facts, or to conflate loose, indirect affiliations with alliances or partnerships.  That is what plaintiffs and Mr. Farah are doing here.  Indeed, plaintiffs' and Mr. Farah's allegations that Hezbollah is providing material assistance and support to the FARC is largely unsubstantiated and based primarily on theory and conjecture.

**C.  *Hezbollah is not "owned, controlled, or directed by, or acting for or on behalf of, [the FARC]."***

38. In my expert opinion, for the same reasons, Hezbollah is not owned, controlled, directed by, acting for, or on behalf of the FARC.  Hezbollah is organized and operates, and establishes and pursues its strategic interests, completely separately from the FARC, and I am aware of no evidence to the contrary.  Again, it is not credible to assert that Hezbollah is somehow a subordinate part of the FARC.  Mr. Farah's unsubstantiated allegations notwithstanding, I have seen no evidence that members of one organization

have any significant interaction with members of the other organization, much less that Hezbollah is subordinate to or controlled or directed by the FARC.

39. In fact, to the extent that Hezbollah is controlled or directed by any other organization or entity, it is the Government of Iran, not the FARC, that serves as Hezbollah's primary political and financial patron. Iran clearly provides principal financial support to Hezbollah and directs many of its operations. I am aware of no example of the FARC funding or directing Hezbollah.

40. Notably, if plaintiffs and Mr. Farah were right that Hezbollah is an "agency or instrumentality" of the FARC, that leads to the unusual – and clearly wrong – result of also making Iran an "agency or instrumentality" of the FARC. Indeed, Mr. Farah has said that Hezbollah is funded by Iran, so Iran, too, would be included within the plaintiffs' definition of an "agency or instrumentality" of the FARC. Obviously, this is just as baseless as deeming Hezbollah to be an agency or instrumentality of the FARC.

**D. *Hezbollah is not "playing a significant role in international narcotics trafficking [related to coca paste or cocaine manufactured or supplied by the FARC]."***

41. Finally, in my expert opinion, Hezbollah is not playing a significant role in international narcotics trafficking relating to cocaine manufactured or supplied by the FARC. Even if Hezbollah were to engage in arms-length, commercial transactions with the FARC (and I know of no evidence to suggest that this is happening), I am aware of no evidence to support the conclusion that Hezbollah is "playing a significant role" in the FARC's cocaine distribution network.

**V.   Summary of Opinion**

42. For the reasons stated above, it is my expert opinion that Mr. Farah's affidavit is fundamentally flawed, inaccurate, and misleading. In my expert opinion, I do not believe

19

that Hezbollah is an "agency or instrumentality" of the FARC, and nothing in Mr. Farah's

opinion adequately supports a contrary conclusion.

I declare and state under penalty of perjury under the laws of the United States of America that
the foregoing is true and correct 28 U.S.C. 1746.

Ibrahim A. Warde
May 11, 2015

**Name**: Ibrahim A. Warde
**DOB**: July 3, 1953
**Marital Status**: married
**Languages**: English (fluent), Arabic (fluent), French (fluent)
**Address**: The Fletcher School, Tufts University, 160 Packard Avenue, Medford, MA 02155
**Telephone**: 617-251-7040
**Fax:**   617-627-3712
**Email**: Ibrahim.Warde@tufts.edu

EDUCATION

Ph.D., Political Science, University of California, Berkeley, May 1988.

M.A., Political Science, University of California, Berkeley, June 1981.

Diplôme de l'Ecole des Hautes Etudes Commerciales (M.B.A.), Jouy-en-Josas, France, June 1977.

B.A. Business Administration, School of Law and Economics, Université Saint-Joseph, Beirut, Lebanon, June 1975.

PUBLICATIONS:

1- BOOKS

- *Islam and Economics*, Edinburgh: Edinburgh University Press 2015 (forthcoming).

- *Islamic Finance in the Global Economy*, Second Edition, Edinburgh: Edinburgh University Press, Second Edition 2010.

- *The Price of Fear: The Truth about the Financial War on Terror*, Berkeley: University of California Press 2007, and London: I.B.Tauris 2007. Foreign language editions: French (Agone-Le Monde Diplomatique), Italian (Neftasia Editore), Japanese (Sankosha) and Czech (Deus). The book was named by *Foreign Affairs* "one the best books of the year about economic, social, and environmental issues."

- *Islamic Finance in the Global Economy*, Edinburgh: Edinburgh University Press 2000.

- *Le modèle anglo-saxon en question*, Paris: Economica 1997 (in French, with Richard Farnetti).

- *Mythologies américaines*, Paris: Editions du Felin 1996, 2nd Edition 2002 (in French, with Marie-Agnès Combesque).

2- BOOK CHAPTERS

21

- « The Status of Islamic Finance », in Craig Nethercott and David Eisenberg, editors, *Islamic Finance: Law and Practice*, Oxford University Press 2012.

- "The War on Terror and the Logic of 'Gated Finance': Impacts on Islamic Finance and the Islamic World," in Irene Schneider and Thoralf Hanstein, Beiträge zum Islamischen Recht V, Frankfurt: Peter Lang 2006.

- "Global Politics, Islamic Finance and Islamist Politics – Before and After September 11, 2001" in Clement Henry and Rodney Wilson (editors), *The Politics of Islamic Finance*, Edinburgh University Press 2004.

- "The United States: Decline and Renewal" in Henri Lelièvre et al., editors, *Les Etats-Unis, maîtres du monde?* Brussels: Complexe 2000.

3- ARTICLES AND POLICY PAPERS

- "Avatars of Checkbook Diplomacy: From the Afghan Jihad to the Arab Spring, *Fletcher Security Review*, Winter 2015.

- "The War on Terror, Crime and the Shadow Economy in the MENA Countries," *Mediterranean Politics*, July 2007.

- "Gulf Sovereign Wealth Funds and the Politics of Boom and Bust," in Sven Behrendt and Bassma Kodmani, Editors, *Managing Arab Sovereign Wealth in Turbulent Times*, Washington, D.C., Carnegie Endowment for International Peace, April 2009.

- "Introduction" in S. Nazim Ali, *Integrating Islamic Finance in the Mainstream: Regulation, Standardization and Transparency*, Islamic Finance Project, Cambridge: Harvard University 2008.

- "Understanding Islamic Finance: Local Innovation and Global Integration," Policy Q&A, *Asia Policy*, No. 6, National Bureau of Asian Research 2008.

- "Islamic Finance After September 11: Toward Arab-Malaysian Integration," in Mercy Kuo and Eric Altbach, *Islamic Finance in Southeast Asia: Local Practice, Global Impact*, Seattle: National Bureau of Asian Research 2008.

- "The Islamic Moral Hazard," in *Proceedings of the Sixth Harvard University Forum on Islamic Finance*, Harvard University 2005.

- "Islamic Finance: A Quarter-Century Assessment," in *Proceedings of the Fourth Harvard University Forum on Islamic Finance*, Harvard University 2001.

- "The Revitalization of Islamic Profit-and-Loss Sharing: Lessons from Western Venture Capital" in *Proceedings of the Third Harvard University Forum on Islamic Finance*, Harvard University 2000.

- "Financial Derivatives," *Problèmes Economiques*, March 15, 1995.

- *Foreign Banking in the U.S.*, San Francisco: IBPC 1980-1999 (updated annually).

- *The Regulation of Foreign Banking in the United States* San Francisco: IBPC 1980-1999 (updated annually).

- *Foreign Investment in U.S. Real Estate*, San Francisco: IBPC 1983, 1985, 1986.

- "Competition in Telephone Handsets Markets", and "Changes in the Technology of Telecommunications Equipment Manufacture and their Employment Consequences", in Michael Borrus, François Bar and Ibrahim Warde, *The Impacts of Divestiture and Deregulation: Infrastructural Changes, Manufacturing Transition, and Competition in the U.S, Telecommunication Industries*, BRIE Policy Paper, Berkeley: Institute of International Studies 1984.

- "Telecommunications in France", and "E.E.C.: Telecommunications and Politics" in Michael Borrus et al., *Telecommunications Development in Comparative Perspective: The New Telecommunications in Europe, Japan and the U.S.*, BRIE Policy Paper, Berkeley: Institute of International Studies 1985.

- "A New Wave of Foreign Investors", *Real Estate Today*, July 1985.

- "Computer-Aided Design/Computer-Aided Manufacturing" in *Programmable Automation*, Office of Technology Assessment, U.S. Congress. Washington: Government Printing Office 1983.

- "International Trade: The Inevitable Conflict", in *Outstanding Papers, 9th Student Conference on International Business*, 47th Chicago World Trade Conference, April 1984 (Winner, 1984 Chicago World Trade Conference Award).

- "Foreign Investors' Market Impact", *Real Estate Today*, June 1983.

4- ARTICLES IN *LE MONDE DIPLOMATIQUE*

The following articles appeared in French. Most were translated in foreign editions of Le Monde Diplomatique (72 foreign editions in 29 languages)

- "Swiss tax evaders, and their handlers, will escape justice: Getting away with it," *Le Monde Diplomatique*, March 2015.

- "Forgotten promises of aid for the Arab Spring: So where is the money?" *Le Monde Diplomatique*, October 2014.

- "Fining the banks for all the wrong crimes: BNP Paribas's sins," *Le Monde Diplomatique,* July

23

2014

- "Blair, Inc." *Le Monde Diplomatique*, November 2012.

- "The Resilience of the Financial Establishment," *Le Monde Diplomatique*, September 2011

- "Goldman Sachs and Governments," *Le Monde Diplomatique*, August 2010.

- "Quants, the New Alchemists of Finance," *Le Monde Diplomatique*, August 2010.

- "Scapegoats of Financial Virtue," *Le Monde Diplomatique*, July 2010.

- "Dubai's Bid for the Guinness Book of Records," *Le Monde Diplomatique*, March 2010

- "Madoff : Globalization of a Ponzi Scheme ," *Le Monde Diplomatique*, August 2009

- "Epitaph to George Bush," *Le Monde Diplomatique*, February  2009.

- "Sovereign Wealth Funds," *Le Monde Diplomatique*, May 2008

- "It's All in the Bonus," *Le Monde Diplomatique, May 2008.*

- "Riches Beyond Belief: Bin Laden As Fantasy Figure," *Le Monde Diplomatique*, September 2007.

- "The Devil's bankers: Deregulation, Money Laundering and Terrorist Financing," *Le Monde Diplomatique, June 2006.*

- "The High Price of the Cheap Dollar," *Le Monde Diplomatique*, March 2005.

- "Iraq: The Failed Eldorado" *Le Monde Diplomatique*, May 2004.

- "The Cost of the Iraqi War," *Le Monde Diplomatique*, April 2003.

- "Which God is on Whose Side?" *Le Monde Diplomatique*, September 2002.

- "Market Daze", *Le Monde Diplomatique*, August 2002.

- "Smiling Serfs of the New Economy," *Le Monde Diplomatique*, April 2002.

- "Chasing Terror's Paymasters," *Le Monde Diplomatique*, November 2001.

- "Paradoxes of Islamic Finance," *Le Monde Diplomatique*, September 2001.

- "Business and Scientific Research : Academic Integrity for Sale", *Le Monde Diplomatique,* March 2001.

- "What Economics Cannot Explain," *Le Monde Diplomatique*, September 2000.

- "Business Schools: Exporting the American Model," *Le Monde Diplomatique*, May 2000.

- "Finance in the New Economy: The AOL-Time Warner Merger," *Le Monde Diplomatique*, February 2000.

- "Financial Bubbles," *Le Monde Diplomatique*, November 1999.

- "Crony Capitalism in the Global Economy," *Le Monde diplomatique*, November 1998.

- "The Asian Crisis," *Le Monde Diplomatique*, February 1998.

- "Philanthropy and Public Policy," *Le Monde Diplomatique*, December 1997.

- "Financial Pyramids in Eastern Europe," *Le Monde Diplomatique*, April 1997.

- "The Tobin Tax," *Le Monde Diplomatique*, February 1997.

- "Rating Agencies and Governments," *Le Monde Diplomatique*, February 1997.

- "The Irish Famine and the Repeal of the Corn Laws, 150 years later," *Le Monde Diplomatique*, May 1996.

- "U.S. Foreign Aid," *Le Monde Diplomatique*, November 1995.

- "The Mexican Bailout," *Le Monde Diplomatique*, November 1995.

- "The Tyranny of the 'Economic Correctness'," *Le Monde Diplomatique*, May 1995.

- "The Crisis in French Real Estate," *Le Monde Diplomatique*,  March  1995.

- "Derivatives and Market Instability," *Le Monde Diplomatique*, July 1994.

- "Bank Failures, Government Rescues," *Le Monde Diplomatique*, July 1994.

- "The Evolution of Development Banks," *Le Monde Diplomatique*, December 1993.

- "The Wall Street Scandals and Their Aftermath," *Le Monde Diplomatique*, August 1993.

- "Financial Deregulation and Small Investor Protection," *Le Monde Diplomatique*, June 1993.

- "Europe: Monetary Chaos, Political Stakes," *Le Monde Diplomatique*, October 1992.

- "The Makers of Liberal Revolutions in Russia and Eastern Europe," *Le Monde Diplomatique*,

May 1992.

- "The B.C.C.I. and North-South Relations," *Le Monde Diplomatique*, December 1991.

- "The G7 and The Global Liquidity Crisis," *Le Monde Diplomatique* July 1991.

- "The New World of Global Finance," *Le Monde Diplomatique*, January 1991.

- "French Banks in Global Markets," *Le Monde Diplomatique*, January 1991.

- "The Impact of the Gulf Crisis on International Politics", *Le Monde Diplomatique,* November 1990.

5- ENCYCLOPEDIA AND REFERENCE BOOK ENTRIES

- Articles on the U.S. and International Political Economy in *L'état du monde: Annuaire économique et géopolitique mondial*, Paris: La Découverte 1996, 1997, 1998, 1999, 2000 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012); in *Dictionnaire Economique et Social*, Paris: La Découverte 2000; in *Le nouvel état du monde: 80 idées-forces pour entrer dans le 21ème siècle*, Paris: La Découverte 2000; in *Guide 1995 de l'actualite de l'annee*, Paris: Editions de l'Atelier 1995 and in *Guide 1994 de l'actualite de l'annee,* Paris: Editions de l'Atelier 1994.

TEACHING EXPERIENCE

1- POLITICAL SCIENCE/POLITICAL ECONOMY/INTERNATIONAL RELATIONS

Informal and Underground Finance, Fletcher School of Law and Diplomacy, Spring 2014, Spring 2015.

Religion in International Politics: Islam and Politics, Fletcher School of Law and Diplomacy, Fall 2012, Fall 2013, Fall 2014, Fall 2015.

Islamic Banking and Finance, Fletcher School of Law and Diplomacy, Spring 2004, Spring 2005, Spring 2006, Spring 2007, Spring 2008, Spring 2009, Spring 2010, Spring 2011, Spring 2012, Spring 2013, Spring 2014, Spring 2015.

The Arabs and Their Neighbors, Fletcher School of Law and Diplomacy, Fall 2009, Fall 2010, Fall 2011, Fall 2012, Fall 2013, Fall 2014, Fall 2015 (taught with Professor Leila Fawaz).

Comparative Politics, University of California, Berkeley, Fall Freshmen Program, Fall 2000, Fall 1999, Fall 1998, Fall 1997, Fall 1996, Fall 1995, Fall 1994, Fall 1993, Fall 1992, Fall 1991, Fall 1990.

Middle Eastern Politics, University of California, Berkeley, Summer 1997, Summer 1995, Spring 1992, Fall 1988.

Honors Seminar in International Relations, University of California, Davis, Winter 1993, Spring 1992, Spring 1991.

International Political Economy:  North-South  Relations   (The Politics of Global Inequality), University of California,  Davis, Spring 1992.

International Political  Economy:  North-North  Relations   (The Politics  of Interdependence), University of  California,  Davis, Spring 1991, Winter 1991, Spring 1990.

International Political Economy, University of California, Santa Cruz, Spring 1987, Winter 1986.

Comparative Foreign Policy, University of California, Santa Cruz, Spring 1986.

Middle Eastern Politics, University of California, Santa Cruz, Spring 1986.

Political Economy, University of California, Santa Cruz, Winter 1986.

2- MBA COURSES/EXECUTIVE SEMINARS

The Islamic World: Political Economy and Business Context, Fletcher School of Law and Diplomacy, M.I.B. Program, Fall 2008, Spring 2009, Spring 2010, Spring 2011, Spring 2012, Spring 2013, Spring 2014, Spring 2015.

Islamic Banking and Finance, Sloan School of Management, Massachusetts Institute of Technology, Spring 2009.

Islamic Banking and Finance, Euromoney Institutional Investor PLC, London. Course director for courses in Bahrain, Doha, Dubai, Kuwait, Jeddah, London, Kuala Lumpur, Paris, Zurich and Singapore (June 2001 to present).

The Political and Social Environment of Business, Saint Mary's College of California, M.B.A. Program, Summer 1992, Summer 1997, Spring 1998, Spring 2001.

Comparative Management: France-U.S. (Study Trips to France), Saint Mary's College of California, Executive M.B.A. Program, January 1999, January 2000.

International Human Resource Management, Ecole Supérieure de Commerce, Rennes, France, Spring 1999, Spring 2000.

Business Ethics, Saint Mary's College of California, M.B.A. Program, Summer 1992, Summer 1997, Spring 1998, Spring 2001.

Cross-Cultural and Comparative Management, Saint Mary's  College,  M.B.A. Program  in International Business, Fall 1997.

International Business Strategy, Saint Mary's College, M.B.A. Program in International Business, Summer 1990, Winter 1991, Summer 1993, Winter 1994, Fall 1995, Fall 1996, Fall 1997.

Global Finance and International Banking Strategy, Saint Mary's College of California, M.B.A. Program in International Business, Summer 1994, Summer 1995, Summer 1996, Summer 1997.

International Management, Saint Mary's College of California, M.B.A. Program, Summer 1993, Winter 1994.

International Market Environments: Western Europe, Eastern Europe, Middle East, Saint Mary's College, M.B.A. Program in International Business, Summer 1991, Winter 1992, Summer 1992.

Business, Government and the Competitive Environment, Saint Mary's College, Executive M.B.A. Program, Spring 1991, Fall 1994, Summer 1996.

International Business and the Multinational Corporation, Saint Mary's College, Executive M.B.A. Program, Winter 1990, Winter 1991, Spring 1996.

KEYNOTE ADDRESSES

"When Islamists Rule: Economic Policies Between Ideology and Pragmatism," Talat and Isabelle Othman Lecture, Center for Middle Eastern Studies, University of Chicago, November 7, 2012.

Inaugural Lecture, Université Paris 1 Panthéon-Sorbonne, Chaire Ethique et Normes de la Finance: "Ethics and Finance: From Moral Philosophy to Financial Engineering, " November 25 2011.

OTHER EXPERIENCE, AFFILIATIONS AND AWARDS

Carnegie Scholar, Carnegie Corporation, New York 2007-2009: 'Financial Practices and Networks in Islamic Countries: Implications for the Financial War on Terror'

Associate Director for Business Programs. Fares Center for Eastern Mediterranean Studies, Tufts University (January 2007-May 2012).

Acting Director, Fares Center for Eastern Mediterranean Studies, Tufts University (Fall 2006).

Course Director, Euromoney Institutional Investor (September 2000-Present)

Consultant, IBPC Paris, New York and San Francisco (September 1977-September 1999).

- Research Affiliate, Center for International Studies, Massachusetts Institute of Technology (October 2002-June 2004).

- Research Affiliate, Center for Middle Eastern Studies, Harvard University (September 2001-May 2002).

- Research Associate, Center for Middle Eastern Studies, U.C. Berkeley, August 1991 to June 1998; Research Assistant, Professor George Lenczowski, U.C. Berkeley, May 1982 - May 1988. Assistance on his book <u>American Presidents and the Middle East</u> (Duke University Press 1989).

- Research Fellow, Berkeley Roundtable on the International Economy (B.R.I.E.), U.C. Berkeley September 1982 - May 1988. Assistance to Professors John Zysman and Stephen Cohen on their book <u>Manufacturing Matters: The Myth of a Post-Industrial Economy</u> (Basic Books 1987).

LANGUAGES

English - fluent
Arabic - fluent
French - fluent