

# ADVISORY

FIN-2017-A006                                            **September 20, 2017**

## Advisory on Widespread Public Corruption in Venezuela

*Reports from financial institutions are critical to stopping, deterring, and preventing the proceeds tied to suspected Venezuelan public corruption from moving through the U.S. financial system.*

**This Advisory should be shared with:**

- *Private Banking Units*
- *Chief Risk Officers*
- *Chief Compliance Officers*
- *AML/BSA Analysts*
- *Sanctions Analysts*
- *Legal Departments*

The Financial Crimes Enforcement Network (FinCEN) is issuing this advisory to alert financial institutions of widespread public corruption in Venezuela and the methods Venezuelan senior political figures (and their associates and front persons) may use to move and hide corruption proceeds.[1]  This advisory also provides financial red flags to assist in identifying and reporting to FinCEN suspicious activity that may be indicative of Venezuelan corruption, including the abuse of Venezuelan government contracts, wire transfers from shell corporations, and real estate purchases in the South Florida and Houston, Texas regions.

Awareness of money laundering schemes used by corrupt Venezuelan officials may help financial institutions (1) differentiate between illicit and legitimate transactions, and (2) identify and report transactions involving suspected corruption proceeds being held or moved by their customers, including through their private and correspondent banking relationships.

Consistent with a risk-based approach, however, financial institutions should be aware that normal business and other transactions involving Venezuelan nationals and businesses do not necessarily represent the same risk as transactions and relationships identified as being connected to the Venezuelan government, Venezuelan officials, and Venezuelan state-owned enterprises (SOEs) involved in public corruption that exhibit the red flags below or other similar indicia.

---

1. "The term 'senior foreign political figure' means a current or former senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not); a senior official of a major foreign political party; or a senior executive of a foreign government-owned commercial enterprise; a corporation, business, or other entity that has been formed by, or for the benefit of, any such individual; an immediate family members of any such individual; and a person who is widely and publicly known (or is actually known by the relevant covered financial institution) to be a close associate of such individual.  For the purposes of this definition, 'senior official or executive' means an individual with substantial authority over policy, operations, or the use of government-owned resources and 'immediate family member' means spouses, parents, siblings, children and a spouse's parents and siblings."  31 CFR § 1010.605(p).  See also 31 CFR § 1010.620.

FINCEN ADVISORY

## Public Corruption in Venezuela

Venezuela faces severe economic and political circumstances due to the rupture of democratic and constitutional order by the government and policy choices.  Endemic corruption, such as that seen in Venezuela, can further damage its economic growth and stability.  Such corruption, particularly related to government contracts and resources, can also deprive populations of their wealth; interfere with efforts to promote economic development; discourage private investment; and foster a climate where financial crime and other forms of lawlessness can thrive.

In recent years, financial institutions have reported to FinCEN their suspicions regarding many transactions suspected of being linked to Venezuelan public corruption, including government contracts.  Based on this reporting and other information, all Venezuelan government agencies and bodies, including SOEs, appear vulnerable to public corruption and money laundering.  The Venezuelan government appears to use its control over large parts of the economy to generate significant wealth for government officials and SOE executives, their families, and associates.  In this regard, there is a high risk of corruption involving Venezuelan government officials and employees at all levels, including those managing or working at Venezuelan SOEs.

### Recent Sanctions Actions

On February 13, 2017, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) designated Venezuelan Vice President Tareck El Aissami (El Aissami) for playing a significant role in international narcotics trafficking pursuant to the Foreign Narcotics Kingpin Designation Act.  On the same day, OFAC also designated his front man, Samark Lopez Bello, for materially assisting El Aissami and acting on his behalf.[2]  Their designation disrupted their ability to launder illicit proceeds, and hundreds of millions in assets associated with Lopez Bello have since been blocked.  On March 8, 2015, the President of the United States issued Executive Order (E.O.) 13692 which blocks property and suspends entry of certain persons contributing to the situation in Venezuela.  E.O. 13692 authorizes the Secretary of the Treasury to designate persons, inter alia, involved in public corruption by senior officials within the Government of Venezuela or persons who have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, such designated persons. On August 25, 2017, the President of the United States issued E.O. 13808 imposing additional sanctions prohibiting certain debt, equity, and profit and dividend disbursement activities with the Government of Venezuela and Venezuelan state-owned oil company, Petroleos de Venezuela, S.A. (PDVSA).[3]

The OFAC designations increase the likelihood that other non-designated Venezuelan senior political figures may seek to protect their assets, including those that are likely to be associated with political corruption, to avoid potential future blocking actions.

---

2. *See* "Treasury Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami and His Primary Frontman Samark Lopez Bello" (February 13, 2017).

3. *See* https://www.whitehouse.gov/the-press-office/2017/08/25/presidential-executive-order-imposing-sanctions-respect-situation.

simple.

FINCEN ADVISORY

# Venezuelan Government Corruption – Red Flags

## *Venezuelan Government Agencies and State-Owned Enterprises*

Transactions involving Venezuelan government agencies and SOEs, particularly those involving government contracts, can potentially be used as vehicles to move, launder, and conceal embezzled corruption proceeds.  SOEs (as well as their officials) may also try to use the U.S. financial system to move or hide proceeds of public corruption.  Among the SOEs referenced in OFAC's recent designations related to Venezuela are the National Center for Foreign Commerce (CENCOEX), Suministros Venezolanos Industriales, CA (SUVINCA), the Foreign Trade Bank (BANCOEX), the National Telephone Company (CANTV), the National Electric Corporation (CORPELEC), Venezuelan Economic and Social Bank (BANDES), and similar state-controlled entities.  As law enforcement and financial institutions increase scrutiny of transactions involving Venezuelan SOEs, corrupt officials may try to channel illicit proceeds through lesser-known or newly-created SOEs or affiliated enterprises.

### *The Role of Currency Controls*

Currency controls in Venezuela limit the supply of U.S. dollars for most economic activities, which encourages the demand for foreign currency and smuggled goods in the parallel market. Although illegal, Venezuela's parallel market is a highly profitable business for those with regime connections that enable them to access inexpensive dollars and goods.[4]  This parallel market relies upon unregulated brokers, whose clients often include criminals who integrate illicit proceeds into the legal economy. Venezuelan officials who receive preferential access to U.S. dollars at the more favorable, official exchange rate, also exploit the multi-tier exchange rate system for profit.

The red flags noted below, which are derived from information available to FinCEN (including suspicious activity reporting), published information associated with OFAC designations, and other public reporting, may help financial institutions identify suspected schemes by corrupt officials, their family members, and associates to channel corruption proceeds, often involving government contracts or resources, through transactions involving Venezuelan SOEs and subsidiaries:

**Government Contracts**: Corrupt officials may use contracts with the Venezuelan government as vehicles to embezzle funds and receive bribes.  In this regard, some financial red flags can include:

 Transactions involving Venezuelan government contracts that are directed to personal accounts.

 Transactions involving Venezuelan government contracts that are directed to companies that operate in an unrelated line of business (e.g., payments for construction projects directed to textile merchants).

---

4.   *See* Banco Central de Venezuela. Law against Illicit Trades, Chapter III, Art.9.


# FINCEN ADVISORY

 Transactions involving Venezuelan government contracts that originate with, or are directed to, entities that are shell corporations, general "trading companies," or companies that lack a general business purpose.

*Members of the regime and their allies direct government contracts to their associated companies to import goods and obtain approval from the Venezuelan Corporation of Foreign Trade (CORPOVEX) for foreign-domiciled companies—often shell companies—to participate in the import activity.[5]  Both the importers and the receiving government officials often divert a portion of the merchandise to the black market, where profits are higher.*

 Documentation corroborating transactions involving Venezuelan government contracts (e.g., invoices) that include charges at substantially higher prices than market rates or that include overly simple documentation or lack traditional details (e.g., valuations for goods and services).  Venezuelan officials who receive preferential access to U.S. dollars at the more favorable, official exchange rate may exploit this multi-tier exchange rate system for profit.

 Payments involving Venezuelan government contracts that originate from non-official Venezuelan accounts, particularly accounts located in jurisdictions outside of Venezuela (e.g., Panama or the Caribbean).

*Export businesses in South Florida that specialize in sending goods to Venezuela are particularly vulnerable to trade-based money laundering (TBML) schemes.  These include businesses that send heavy equipment, auto parts, and electronics (cell phones and other appliances) from Florida to Venezuela.*

 Payments involving Venezuelan government contracts that originate from third parties that are not official Venezuelan government entities (e.g., shell companies).

*Public reports indicate that the use of third parties, or brokers, to deal with government entities is common in Venezuela and is a significant source of risk.  Brokers, particularly when colluding with corrupt government officials, can facilitate overseas transactions in a way that circumvents currency controls and masks payments from SOEs.*

 Cash deposits instead of wire transfers in the accounts of companies with Venezuelan government contracts.

In addition, other financial red flags observed in transactions suspected of involving Venezuelan government corruption include:

 Transactions for the purchase of real estate—primarily in the South Florida and Houston, Texas regions—involving current or former Venezuelan government officials, family members or associates that is not commensurate with their official salaries.

 Corrupt Venezuelan government officials seeking to abuse a U.S. or foreign bank's wealth management units by using complex financial transactions to move and hide corruption proceeds.

---

5.  For more information on CORPOVEX, see http://www.corpovex.gob.ve/quienes-somos-2/.

F I N C E N   A D V I S O R Y

## Reminder of Regulatory Obligations for U.S. Financial Institutions

FinCEN is providing the information in this advisory to assist U.S. financial institutions in meeting their due diligence obligations that may apply to activity involving certain Venezuelan persons.  To best meet these obligations, financial institutions should generally be aware of public reports of high-level corruption associated with senior Venezuelan foreign political figures, their family members, associates, or associated legal entities or arrangements.  Financial institutions should assess the risk for laundering of the proceeds of public corruption associated with specific particular customers and transactions.  Financial institutions also should be aware that OFAC has designated (and provided related guidance on) several Venezuelan persons and entities located in or related to Venezuela.[6]

Consistent with existing regulatory obligations, financial institutions should take reasonable, risk-based steps to identify and limit any exposure they may have to funds and other assets associated with Venezuelan public corruption.  Such reasonable steps should not, however, put into question a financial institution's ability to maintain or continue otherwise appropriate relationships with customers or other financial institutions, and should not be used as the basis to engage in wholesale or indiscriminate de-risking of any class of customers or financial institutions.  FinCEN also reminds financial institutions of previous interagency guidance on providing services to foreign embassies, consulates, and missions.[7]

### Enhanced Due Diligence Obligations for Private Bank Accounts

Under section 312 of the USA PATRIOT Act (31 U.S.C. § 5318(i)), U.S. financial institutions have regulatory obligations to apply enhanced scrutiny to private banking accounts held by, or on behalf of, senior foreign political figures and to monitor transactions that could potentially represent misappropriated or diverted state assets, the proceeds of bribery or other illegal payments, or other public corruption proceeds.[8]

---

6. *See* https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20170518.aspx.  For more information on OFAC's sanctions related to Venezuela, *see* https://www.treasury.gov/resource-center/sanctions/Programs/Pages/venezuela.aspx.

7. *See* Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Financial Crimes Enforcement Network, National Credit Union Administration, Office of the Comptroller of the Currency, and Office of Thrift Supervision, "Interagency Advisory:  Guidance on Accepting Accounts from Foreign Embassies, Consulates, and Missions," March 24, 2011 and Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Financial Crimes Enforcement Network, National Credit Union Administration, Office of the Comptroller of the Currency, and Office of Thrift Supervision, "Interagency Advisory:  Guidance on Accepting Accounts from Foreign Governments, Foreign Embassies, and Foreign Political Figures," June 15, 2004.

8. For FinCEN's implementing regulations see 31 CFR § 1010.620 and 1010.210 as further proscribed in 31 CFR § 1020.210, 1021.210, 1022.210, 1023.210, 1024.210, 1025.210, 1026.210, 1027.210, 1028,210, 1029.210, and 1030.210

## FINCEN ADVISORY

FinCEN's regulations implementing Section 312 require a written due diligence program for private banking accounts held for non-U.S. persons that is designed to detect and report any known or suspected money laundering or other suspicious activity.[9] Accordingly, covered financial institutions maintaining private banking accounts for senior foreign political figures are required to apply enhanced scrutiny of such accounts to detect and report transactions that may involve the proceeds of foreign corruption.[10]

### General Obligations for Correspondent Account Due Diligence and Anti-Money Laundering (AML) Programs

U.S. financial institutions must comply with their general due diligence obligations under 31 CFR § 1010.610(a) and their AML program requirements under 31 U.S.C. § 5318(h) and 31 CFR § 1010.210.  In addition, as required under 31 CFR § 1010.610(a), covered financial institutions should ensure that their due diligence programs, which address correspondent accounts maintained for foreign financial institutions, include appropriate, specific, risk-based, and, where necessary, enhanced policies, procedures, and controls that are reasonably designed to detect and report known or suspected money laundering activity conducted through or involving any correspondent account established, maintained, administered, or managed in the United States.

### Suspicious Activity Reporting

A financial institution is required to file a suspicious activity report (SAR) if it knows, suspects, or has reason to suspect a transaction conducted or attempted by, at, or through the financial institution involves funds derived from illegal activity, or attempts to disguise funds derived from illegal activity; is designed to evade regulations promulgated under the Bank Secrecy Act (BSA); lacks a business or apparent lawful purpose; or involves the use of the financial institution to facilitate criminal activity, including foreign corruption.[11]

### Additional SAR Reporting Guidance on Senior Foreign Political Figures

In April 2008, FinCEN issued Guidance to assist financial institutions with reporting suspicious activity regarding proceeds of foreign corruption.[12]  A related FinCEN SAR Activity Review, which focused on foreign political corruption, also discusses indicators of transactions that may be related to proceeds of foreign corruption.[13]  Financial institutions may find this Guidance and the SAR Activity Review useful in assisting with suspicious activity monitoring and due diligence requirements related to senior foreign political figures.

---

9. *See* 31 CFR § 1010.620(a-b).  The definition of "covered financial institution" is found in 31 CFR § 1010.605(e).  The definition of "private banking account" is found in 31 CFR § 1010.605(m).  The definition for the term "non-U.S. person" is found in 31 CFR § 1010.605(h).
10. 31 CFR § 1010.620(c).
11. *See generally* 31 CFR § 1020.320, 1021.320, 1022.320, 1023.320, 1024.320, 1025.320, 1026.320, 1029.320, and 1030.320.
12. *See* FinCEN Guidance FIN-2008-G005: "Guidance to Financial Institutions on Filing Suspicious Activity Reports Regarding the Proceeds of Foreign Corruption," (April 2008).
13. *See* Bank Secrecy Act Advisory Group "Focus:  Foreign Corruption," SAR Activity Review, Issue 19, May 2011, particularly pages 29-69.

F I N C E N   A D V I S O R Y

### SAR Filing Instructions

When filing a SAR, financial institutions should provide all pertinent available information in the SAR form and narrative. FinCEN further requests that financial institutions **select SAR field 35(l) (Suspected Public/Private Corruption (Foreign)) and reference this advisory by including the key term:**

*"Venezuelan Corruption"*

**in the SAR narrative and in SAR field 35(z) (Other Suspicious Activity-Other)** to indicate a connection between the suspicious activity being reported and the persons and activities highlighted in this advisory.

SAR reporting, in conjunction with effective implementation of due diligence requirements and OFAC obligations by financial institutions, has been crucial to identifying money laundering and other financial crimes associated with foreign and domestic political corruption. SAR reporting is consistently beneficial and critical to FinCEN and U.S. law enforcement analytical and investigative efforts, OFAC designation efforts, and the overall security and stability of the U.S. financial system.[14]

### For Further Information

Additional questions or comments regarding the contents of this advisory should be addressed to the FinCEN Resource Center at FRC@fincen.gov. *Financial institutions wanting to report suspicious transactions that may potentially relate to terrorist activity should call the Financial Institutions Toll-Free Hotline at (866) 556-3974 (7 days a week, 24 hours a day).* The purpose of the hotline is to expedite the delivery of this information to law enforcement. Financial institutions should immediately report any imminent threat to local-area law enforcement officials.

**FinCEN's mission is to safeguard the financial system from illicit use and combat money laundering and promote national security through the collection, analysis, and dissemination of financial intelligence and strategic use of financial authorities.**

---

14. For example case studies, see SAR Activity Review, Issue 19, beginning on page 25 and Law Enforcement Case Examples.